NICANOR ELIZANDO v. THE STATE.

*No. 17.   Decided November 5.*

**1. Charge of the Court—Accomplice Testimony.**—With regard to accomplice testimony, it is ordinarily sufficient if the charge of the court submit the law upon that subject in the language of the statute.   And where this has been done, and the defendant fails to ask more explicit instructions, he can not complain.

**2. Same.**—Where the evidence does not connect a witness with the offense in such manner as to constitute him an accomplice, the court should not charge upon the law of accomplice testimony.

**3. Guilty Knowledge.**—Guilty knowledge alone, without participancy in the crime, will not constitute one an accomplice.

**4. Accomplice Testimony—Submission of, in Charge.**—Where the fact as to whether a witness is an accomplice is neither admitted nor placed

beyond doubt by the evidence, it is not improper for the court to submit the question, under appropriate instructions, to the jury to be determined by them; following Zollicoffer v. The State, 16 Texas Court of Appeals, 312; White v. The State. 30 Texas Court of Appeals, 653.

5. Charge of Court—When Facts May be Assumed in.—It is an ordinary rule, that all questions of fact should be submitted to the jury for their determination; but if facts be admitted, there is no reason why the court should not assume the same, nor would a charge assuming them, under such circumstances, be obnoxious to the objection that it was on the weight of testimony.

6. Murder in Perpetration of Robbery.—See a statement of facts in the record held by the court to be amply sufficient, independent of the testimony of the accomplice, to support a conviction for murder in the first degree, committed in the perpetration of robbery.

APPEAL from the District Court of Wilson. Tried below before Hon. GEORGE MCCORMICK.

Appellant was indicted for the murder of one Michael Birnes, and appeals from a judgment for murder in the first degree, with the penalty assessed at death.

Blas Alderett, for the State, testified, through an interpreter: Knew Mr. Birnes. Found him dead, near his house, in Wilson County, Texas, on the evening of the 16th of May, 1892. Deceased was lying on his face, fifty or sixty varas from his house. Went after Mr. Faust, and when we returned we examined the body and found that it had a bullet hole in the back of the head. · Saw no other wounds at that time. This was about 4 or 5 o'clock in the afternoon. When witness first went to deceased's house that evening he found it open and no one at home. . Deceased's trunk was open and some papers scattered around the room. He then went out to look for deceased and found the dead body. When he returned to the body with Mr. Faust and his wife he found a quirt, broken in two pieces, lying within a step or two of the body. Did not take hold of the quirt, and don't know its weight. Witness lived about one-half or three-quarters of a mile from deceased. Was on friendly terms with, and frequently visited him. Saw him Sunday morning at his house, and went to church with him. No one lived with deceased. Had known him six or seven years. Did not know, and could not identify, the quirt spoken of.

Mack Faust testified, for the State, as follows: I was acquainted with the deceased. He was about 64 years old; was not in good health when killed. Have known him sixteen or seventeen years. I live about one-half mile from his house. First learned of his death from Blas Alderett on the afternoon of May 16, 1892. I went immediately with Blas Alderett to see the body. Found it on his place, sixty or seventy yards from his house. Examined the body and found a bullet hole through his head, coming out through his right eye. Also had a wound across the back part of his head and one across the side of his head. Deceased's

eyesight was defective; was more than an ordinarily weak man. The body had the appearance of having been dead fifteen or twenty hours. Saw deceased on the 15th of May, at my house, about 5 o'clock p. m. We found a loaded quirt near his body, which had been broken in two pieces. The body of deceased was smelling badly; had fly-blows. The wounds across the head looked like they had been made with a club. We examined the deceased's pockets, but found nothing; found the key of the dwelling between body and the house. It rained Sunday night, May 15; we could find no tracks. The deceased's house showed signs of having been searched. The wound in back of deceased's head was made by a single bullet from a 38 to 45-caliber. Deceased's hat was on his bed in his house. There were no weapons or money in his house. His lantern was hanging on a nail just over his trunk; examined lantern, and to all appearances it had burned out. Deceased was very feeble; a 12-year-old boy could have handled him. Was with Fred House when we found a paper sack containing charcoal, about 200 yards from deceased's house.

Antonio Estrada testified, for the State: I know defendant. (Identifies him.) I knew deceased, Mr. Birnes; he is dead. I know who killed him. Defendant killed him in Wilson County, Texas. I was present when he killed him. It was on Sunday night, May 15, 1892. Defendant killed him with a pistol and a quirt. The quirt belonged to Pancho Aguilla. Defendant and I started from my house, on Sunday evening, May 15, 1892, to deceased's house to kill him, because he had some money. Defendant told me that old man Birnes had gotten some school money, and asked me to go with him to help him (defendant) rob the deceased. Defendant told me about this Sunday evening, about 5 o'clock, at my house. I told defendant at first that I would not go with him to help rob the deceased. Defendant then said that if I did not go with him and assist him that I was not a man. Deceased lived about one mile from my house. Defendant first came to my house about 5 o'clock that day, but left in a short time, and returned about sundown. Before we left to go to deceased's house we ground some charcoal at my house; we ground it with an old ax. Prepared the charcoal to disguise ourselves with; put it in a paper sack and put it in our pockets. Started to deceased's house on foot. When we came within about 200 yards of his house we stopped, painted ourselves with the charcoal, and threw the paper away. (Witness identifies paper sack containing the charcoal.)

After this we started on to deceased's house, with defendant in the lead. Stopped near the house; saw deceased sitting on the gallery, reading a paper; in a few moments he got up out of his chair and went into the house; came out of the house and went out by the side of the house to the cistern. Defendant then told me it was time for us to act. Defendant then caught deceased by the arm and covered him with his pistol, and yelled for me to help him, and I told him I would not. Defendant

then pulled deceased in the house, and came out in a few minutes.   At this time I was standing near the porch.   Defendant then asked deceased to give him what money he had.   Deceased told him that he did not have any money with him; that he had left all his money at Mr. Scott's store.   Defendant then took deceased by the arm and dragged him to the place where he killed him.   Deceased said to defendant, " Don't kill me." That he (deceased) had more money at Scott's store; that if defendant would let him go he would go to the store and get him some more money. Defendant then took a quirt from his body and struck deceased several times with it.   Deceased fell to the ground, with his hands on his face. Defendant then shot deceased in the back of the head with his pistol. After shooting him defendant started off toward my house in a run, but after running a short distance stopped and waited until I caught up with him.   We then went to my house.   My wife was at the house when we arrived; was in bed, but was awake.   Upon reaching the house we first called for some water, and after washing the charcoal from our hands and faces we began to talk and smoke; were in the same room with my wife.   After smoking defendant took the money and began to count it. There was $8.10.   Defendant said that he was not going to give me any of the money, because I did not help him rob and kill deceased.   I told him I did not want any of the money.   He then left $2 on my table, which I took and spent.

While talking in my house, defendant said that the worst thing he had done was to leave the broken quirt near the deceased.   The next morning, when I went to saddle my horse, I missed my quirt from my saddle. Defendant said that he had left it near the body of deceased.   This was the first time I learned that defendant had used my quirt in killing deceased.   I got the quirt from Pancho Aguilla.   Defendant stayed all night with us that night.   The day following the killing, defendant, my brother Jose Estrada, and myself started off up the river, and when we got opposite Talimantes' house defendant said he was going to see his brother, and left us and went off in that direction.   I did not see him any more that day.   The pistol with which defendant did the killing belonged to Siciredo Estrado.   I know the pistol.   (Identifies the pistol.) Defendant returned the pistol on Monday morning to its owner.   He borrowed it on Saturday evening.   Defendant and I were both in Floresville on Saturday evening preceding the killing.   I did not go into the house of deceased, but was on the gallery.   I wore a dark colored shirt, and defendant wore a white shirt.

Cross-examined:   I did not stop defendant from killing deceased, because it was none of my business.   I did not think it funny to hear the old man begging for his life, but I did not help to kill him.   Defendant first made the proposition to me on Sunday afternoon about 5 o'clock. This was the first time he had spoken to me about this matter.

Juliana Estrada testified, for the State:  I am the wife of Antonio Estrada.  Heard of the killing the day after it was done.  Defendant was at my house, with my husband, on Sunday, May 15, 1892, about 5 o'clock p. m.  About dark defendant and my husband left the house.  I knew where they were going.  My husband had told me on Sunday morning that he and defendant were going to rob and kill deceased; that deceased had some money.  Before leaving the house on that night, defendant and my husband ground some charcoral with an old ax, put it in a paper sack, and carried it with them.  I had tried to get my husband not to go with defendant, and told him that if they got into trouble defendant could not get him out.  My husband said that defendant told him that if he did not go with him to rob deceased that he (my husband) was no man, and he said he was going with defendant to show him that he was a man.  Defendant and my husband left the house and were gone sometime.  After they returned, I could hear them talking together outside of the house.  I heard defendant say that he had killed the old man because he would not give him any more money.  I was in bed, but was awake.  They then came into the house and sat down to smoke.  They had some money, and began to divide it.  I do not know how much money they had.  Don't know how much defendant gave my husband, but they made a division, and he got part of it.  Defendant said that deceased had more money at Scott's store, and offered to go and get it for him, if he (defendant) would not kill him.  I have not talked with my husband since he was arrested.  The defendant and my husband ground the charcoal on a box, with an ax, at my house.

Pancho Auguilla testified, for the State:  I loaned Antonio Estrada my quirt two months ago.  I would know it.  (Identifies the quirt.)  I know when deceased was killed.  I loaned Estrada my quirt about one month previous to the killing.

A. G. Thomas testified, for the State:  I was bailiff for the grand jury last week.  I visited the house of Antonio Estrada.  I saw an old ax near the house; it was covered with charcoal; it was lying near a box, which was used for a doorstep.  The box had some charcoal dust on it.  I found several pieces of charcoal near the box.

Nicanor Elizando testified:  I am the defendant in this case.  On Sunday night, May 15, I stayed all night with Pancho Estrada.  I did not go to the house of Antonio Estrada that day, after leaving there on Sunday morning.  I did stay at Antonio Estrada's house on Saturday night, but left early on Sunday morning, the 15th.  Antonio Estrada and myself went to the San Antonio River and went in bathing.  After this Antonio went back home, I suppose.  I went to the house of Pancho Estrada and remained there all day and night.  I borrowed a pistol from Ciciredo Estrada on Saturday evening, and carried it with me to a dance on Sat-

urday night. Antonio Estrada was with me at the dance. After the dance, I went home with him, and remained at his house all night, but left early the next morning. I met Ciciredo Estrada, the owner of the pistol, the next morning, while on my way to Pancho Estrada's house; he then asked me for his pistol, and I gave it to him. This was on Sunday morning. I first heard of the killing on Tuesday morning. I met Fred House, and he told me about it. This was the first that I had heard of it. I knew nothing about the killing until House told me. Antonio Estrada has told this tale against me, as I believe, to shield himself; at any rate it is untrue. I have listened to his testimony, and it is false from beginning to end. I am a comparative stranger in this country; have lived here but two years. I came from Mexico. I am innocent of this charge.

No briefs for either party have come into the hands of the Reporter.

DAVIDSON, JUDGE.—Appellant was indicted for murder committed in the perpetration of robbery. Upon the trial a verdict of guilty was returned by the jury, assessing the death penalty, and from this conviction appellant prosecutes this appeal. The record does not contain an assignment of error, nor have there been briefs filed in this court.

The motion for a new trial attacks the court's charge, because it fails to instruct the jury that the evidence corroborating the statement of the accomplice must tend directly and immediately to connect the defendant with the offense committed. In this connection and upon this subject the court gave in charge the statute; such a charge has been held by repeated decisions of this court to be usually sufficient. Simms v. The State, 8 Texas Ct. App., 230; Jackson v. The State, 4 Texas Ct. App., 292; Avery v. The State, 10 Texas Ct. App., 199; Hoyle v. The State, 4 Texas Ct. App., 239.

If the defendant had desired other charges, submitting more fully the law in this respect, he should have requested the same to have been given. This was not done, nor did he reserve exceptions to the charge as given. Not only does the corroborating evidence directly connect defendant with the homicide, but, if true, it was sufficient to support the conviction, independent of the testimony of the accomplice. The charge, under the facts of this case, was not erroneous, and the court did not err in refusing the new trial for this reason.

Another ground stated in the motion for the new trial is, "the court erred in not instructing the jury that Juliana Estrada was an accomplice, whose testimony should be corroborated." The court did not err in failing to so charge the jury. In the first place, the evidence before us does not connect this witness with the offense so as to constitute her an accomplice, and therefore does not require a charge upon that issue. The fact

that she was the wife of one of the guilty participants to the homicide, and knew that a conspiracy had been entered into between her husband and defendant to commit the crime, and subsequently heard the defendant's confession of guilty participancy in the deed, does not constitute her an accomplice.  Smith v. The State, 23 Texas Ct. App., 357; Noftsinger v. The State, 7 Texas Ct. App., 301; Rucker v. The State, 7 Texas Ct. App., 550.  A wife may be an accomplice to her husband so as to require corroboration of her testimony, but the facts in this case do not show her to be such.

But in the next place, if it be conceded that the facts adduced raise such an issue, in connection with her testimony, still it would not be incumbent upon the court to charge in affirmative terms that she was an accomplice.

It was sufficient to submit that question to the jury as a question of fact to be determined by them, which was done.  In cases where that fact is not admitted or placed beyond doubt, it is not improper to submit such question under appropriate instructions to the jury, to be determined by them.  Zollicoffer v. The State, 16 Texas Ct. App., 312; White v. The State, 30 Texas Ct. App., 653.

As a usual rule, all questions of fact should, under proper instructions, be submitted to the jury for their determination.  But if the facts are admitted to be true, we can see no reason why the court should be debarred from so assuming, nor do we believe such a charge would be upon the weight of the testimony; but if there is an issue arising upon the facts, then the court can not so assume, but must submit such issue to the jury for their determination.

Therefore the court did not err in charging the jury that Antonio Estrada, one of the parties who did the killing, was an accomplice, nor was it error to submit the question of the wife's participancy in or guilty connection with the crime to the jury, under appropriate instructions.  The error in this matter, if any, consists in the fact that the question was submitted at all, when the facts before us do not constitute her an accomplice.  But of this defendant can not be heard to complain.

It is also urged in the motion for a new trial, that the court erred in failing to charge the jury that the burden of proof was on the State to corroborate the testimony of the accomplice in order to maintain the conviction, and that it was incumbent on defendant to disprove uncorroborated testimony of the accomplice.  While it is required of the State to prove the case in order to sustain the conviction, and to corroborate the testimony as required by the statute, yet it is sufficient, usually, as we have seen, to charge the law in this respect as set out in the statute.  If such corroboration has not been shown, the conviction can not and will not be permitted to stand.  Uncorroborated testimony of an accomplice will not sustain a conviction; and if that be the attitude of the case, when

submitted to the jury, it would be the duty of the court to instruct an acquittal, or, in case of conviction, to set aside such conviction.

The law with reference to the burden of proof was charged by the court. The court did not err in this matter. It is contended that the facts do not justify the verdict. Omitting the testimony of Juliana Estrada, it is doubtful if the accomplice, Antonio Estrada, was corroborated as required by the statute. But if the evidence of said Juliana Estrada be true, there is no question of defendant's guilt, even if the testimony of Antonio Estrada be discarded from the case. The defendant denied in most positive terms his connection with and participation in the murder and robbery. If he is correct, the two State's witnesses, Estrada, are guilty of perjury in its worst form, and deserve the severest punishment. But if they testified truthfully, then defendant and his confederate, Estrada, are guilty of a most horrible and brutal murder, and one committed in the perpetration of robbery of a feeble and decrepit old man, who was totally unable to contend with either of them in a struggle for his life or his money. The verdict was against the defendant, and we do not feel like disturbing it.

We find no reversible error in the record, and the judgment is affirmed.

*Affirmed.*

Judges all present and concurring.