## OTTO NAMI v. THE STATE.

No. 8104.   Decided May 7, 1924.

Rehearing denied June 4, 1924.

1.—Murder—Requested Charge—Defensive Theory.

Where, upon trial of murder and a conviction of that offense, the facts raised the issue, the following requested charge should have been given: You are instructed that the defendant had the legal right to protect or defend Maggie Ross, or her child, or either of them against an unlawful assault on the part of John Ross.   If, therefore, you believe from the evidence that the deceased tried to force an entrance into the room of Maggie Ross with the purpose of unlawfully assaulting said Maggie Ross, or her child, or either of them, and that defendant knew of such unlawful purpose, or if it reasonably then and there so appeared to the defendant, taking into consideration his knowledge, if any, of the character and disposition of the deceased, then the defendant had the right to interfere and prevent deceased from entering said room, or from making such an assault on Maggie Ross or said child, or either of them.

2.—Same—Requested Charge—Theory of Defense.

Where, upon trial of murder, the jury were called upon to determine whether the shooting was upon malice, or under circumstances reducing to manslaughter, or in self-defense, what was done and said by the parties immediately before the shooting became its antecedent and may have created the mental attitude which would give character to the homicide as being upon malice, or upon sudden passion, or in self-defense.

3.—Same—Requested Charge—Defensive Theory.

Analysis of the requested charge above quoted indicates that its purpose was merely to inform the jury as to appellant's right to do what he claimed he did in the initial part of the transaction, that is, to interfere and prevent deceased from entering the room of Mrs. Ross, provided the appellant knew that the purpose of deceased was to assault her, or if it reasonably appeared to him from what occurred and from his knowledge of the character and disposition of the deceased that such was his purpose, and such requested charge should have been given.

4.—Same—Requested Charge—Defensive Theory.

The requested charge, as above stated, does not seek to set forth any right of acquittal on the ground of defense of the woman, and as this court understands it, is confined to an announcement of the right of appellant to prevent deceased from entering the room of Mrs. Ross, if he knew or had a reasonable ground to believe that the purpose of deceased in such entry was to unlawfully assault her, and said requested charge should have been submitted.

5.—Same—Evidence—Declarations of Third Party.

Upon trial of murder, there was no reversible error of the refusal to allow Uffie McLean, a niece of Mrs. Ross, to testify that before the killing she and appellant discussed with a lady whom they met at a beauty parlor, the fact of their engagement, and advised with her as to their marriage; under the facts of the instant case.

**6.—Same—Evidence—Bill of Exceptions—Attitude Towards Deceased.**

Upon trial of murder, there was no reversible error in refusing to admit in evidence the statements attributed to appellant by his witness Ruiz, as set out in the bill of exceptions and quoted above, as it did not seem to evidence any intercessory effort on his part with Mrs. Ross.

**7.—Same—Evidence—Cross-Examination—Harmless Error.**

Where, upon trial of murder, the defendant, for the purpose of showing the violent character of deceased and his treatment of his wife, introduced the testimony of his witness Rogers who boarded at the Ross home about a year before this killing, and who testified to a family row, there was no error to permit by cross-examination the introduction of the statement from Mrs. Ross, that deceased was harmless, etc.

**8.—Same—Declarations of Deceased—Evidence—Res Gestae.**

Upon trial of murder, there was no error in admitting in evidence the statements made by deceased after the shooting, it being shown that at the time that deceased was bleeding on the way to the hospital and seemed to be in pain, and repeated ten or fifteen times, "Oughtn't to shoot a man in the back;" it not being denied that he was shot in the back.

**9.—Same—Evidence—Statement Made by Deceased—Res Gestae.**

Upon trial of murder, there was no error in admitting in evidence the testimony of sheriff Miller as to a statement made by deceased while on the operating table at the hospital; the time element involved in determining its admissibility being well within two hours after the shooting, and that the deceased was suffering from a mortal wound and in great pain. Such statement was *res gestae*, and not merely the opinion or conclusion of deceased. Following: Clark v. State, 56 Texas Crim. Rep., 293, and other cases.

**10.—Same—Evidence—Declarations by Deceased.**

Upon trial of murder, there was no error in admitting the statement of deceased as testified to by officer Cloud, that shortly after the shooting and while deceased was lying on the floor of the room where he was shot, he said: "I guess I am to blame, they don't want me here." Under the well settled rule, that in case there be matter partly admissible and partly not an objection is made to the whole, and it is so passed upon by the trial court, this presents no error. Following: Martin v. State, 189 S. W. Rep., 266.

**11.—Same—Rule Stated—Statements of Deceased.**

Many authorities support the proposition that an opinion in so far as it consists of a statement of an effect produced upon the mind of the party uttering it, becomes primary evidence, and hence admissible whenever the conditions are such as that they cannot be reproduced and made palpable in the concrete.

**12.—Same—Evidence—Res Gestae—Co-Conspirators.**

Upon trial of murder, the testimony of officer Stubbs that when he told appellant to put on his clothes and go to the station and the latter went into a room to dress, Mrs. Ross made two efforts to get into the room where appellant was. These were acts and statements of co-conspirators after the consummation of the conspiracy, and if connected therewith closely enough were *res gestae*. Following: Egleston v. State, 59 Texas Crim. Rep., 542.

**13.—Same—Evidence—Acts of Co-Conspirators.**

Upon trial of murder, the testimony relative to the acts and conduct of appellant and Mrs. Ross, at the office of the U. S. marshal, and at the jail subsequently, and that she called him "sweetheart" at her home on the night of the shooting, were admissible as circumstances showing and tending to support the theory of a conspiracy between the appellant and Mrs. Ross.

**14.—Same—Rehearing—Evidence—Explanation.**

In deciding the point upon which the reversal is based in the original opinion, this court has not done violence to or extended the practice concerning the law applicable to one who, for the purpose of an explanation, seeks another while armed with a pistol or other deadly weapon, and one doing so, does not necessarily forfeit the right of self-defense. Following: Shannon v. State, 35 Texas Crim. Rep., 2, and other cases.

**15.—Same—Defense of Another—Rule Stated.**

The announcement in the instant case applies to another principle, namely, that one may take life to prevent the murder of another person and that in doing so the law throws around him the same shield as though he were defending himself, and when the evidence presents this issue the obligation rests upon the trial court upon demand of the accused to give to the jury a charge upon that subject, and this principle prevails notwithstanding the appellant may testify that he acted in his own defense. Following: Bonner v. State, 29 Texas Crim. App., 223, and other cases.

**16.—Same—Case Stated—Theory of Defense.**

In the present case, according to the theory advanced by the appellant resting upon his testimony, the initial step taken by him in the difficulty which culminated in the death of the deceased was the appellant's interposition against the execution of deceased's threat to kill his wife, and the court should have submitted a proper charge upon this theory of defense.

**17.—Same—Evidence—Previous Engagement of Defendant.**

It is the conception of this court based on the record on appeal that there is no showing made of an attack on the testimony of Miss McLean, the financee of defendant, warranting the introduction of the proffered testimony as to her engagement to marry defendant; besides, the fact that they were engaged to be married prior to the homicide was in evidence. Following: Taylor v. State, 87 Texas Crim. Rep., 331.

**18.—Same—Declarations of Third Party—Evidence.**

Concerning the proffered testimony of the witness Ruiz that the appellant advised and urged Mrs. Ross to let Mr. Ross, her husband, in, and interceded for him, saying: "Uncle John, I don't want you to come in and treat mamma like you did the other day," and Ross's reply: "No, I won't do anything; I want to go in and lie down," this court is obliged to again confess its inability to discern from the bill of exceptions that error was committed.

**19.—Same—Evidence—Declarations of Third Party.**

Relative to the testimony of the witness Rogers reproducing a part of the conversation between himself and Mrs. Ross, to which reference is made in the original opinion, it is the claim on the part of the State that this evidence was received with the consent of appellant's counsel. This, however, is denied, but it will doubtless not present itself in the same manner in another trial, and need not now be discussed.

20.—Same—Res Gestae—Rule Stated.

The *res gestae* rule in Texas is statutory, and it is not within the discretion of the courts to either repeal or modify it. It is their duty to construe and apply it, and this court must, therefore, hold that the declarations of the deceased to which objection was pointedly made were *res gestae* and admissible in evidence. However, the declarations of the deceased made at the sanitarium that they had no right to shoot him was no part of the *res gestae*.

Appeal from the District Court of Hays. Tried below before the Honorable M. C. Jeffrey.

Appeal from a convition of murder; penalty, eighteen years imprisonment in the penitentiary.

The opinion states the case.

*Dickens & Dickens, Barber* and *Johnson,* and *H. G. Nami,* for appellant.—On question of fabrication of evidence and exclusion of certain testimony by the defense: Williams v. State, 24 Texas Crim. App., 655; Mitchell v. State, 36 Texas Crim. Rep., 302; Jones v. State, 38 id., 102; Streight v. State, 62 id., 453; Phillips v. State, 73 id., 323; Satterwhite v. State, 77 id., 139; Polk v. State, 238 S. W. Rep., 936.

On question of hearsay testimony: Woodward v. State, 58 S. W. Rep., 141; Chenault v. State, 81 id., 972; Irby v. State, 25 Texas Crim. App., 214.

On question of declaration of wife of deceased as to her husband being harmless: Clark v. State, 56 Texas Crim. Rep., 297; Kemp v. State, 138 S. W. Rep., 1028; Young v. State, 59 Texas Crim. Rep., 139.

On question of res gestae statements: Bradbury v. State, 22 Texas Crim. App., 273; Carter v. State, 44 Texas Crim. Rep., 312; Willis v. State, 239 S. W. Rep., 214; Couch v. State, 245 id., 694; Bateson v. State, 46 Texas Crim. Rep., 34; Manly v. State, 62 id., 392.

*Tom Garrard,* Attorney for the State and *Grover C. Morris,* Assistant Attorney and *Dan Moody,* District Attorney, for the State.—On question of fabricating evidence: Douchette v. State, 45 S. W. Rep., 800; Jones v. State, 41 id., 638.

On question of res gestae statement: Williams v. State, 86 Texas Crim. Rep., 626.

On question of shorthand rendition of facts: Couch v. State, 245 S. W. Rep., 693; Connell v. State, 46 Texas Crim. Rep., 259, and cases cited in opinion.

LATTIMORE, JUDGE.—Appellant was convicted in the District Court of Hays County of murder, and given eighteen years in the penitentiary.

In view of our disposition of this case we shall discuss the facts no further than may be necessary to make plain our conclusions.

Appellant was a student in the University of Texas, and on the 9th or 10th of January, 1922, began boarding at the home of deceased under an arrangement, as testified to by him, made with Mrs. Ross, wife of deceased. On the 4th of the following February at about 9 o'clock p. m. appellant shot and killed deceased at the family home in South Austin. On the premises at the time were appellant, deceased, Mrs. Ross and two young sons of deceased, one of the latter being in bed with his mother apparently when the shooting took place. This boy and appellant testified for the defense. Deceased was staying in the country, and came in town the afternoon before he was shot that night. Deceased was shot through the body from the rear and was found by the officers lying in a dark dining room on the east side of a hall which seems to have run the length of the house north and south. Mrs. Ross' bed room was on the west side of said hall and was the southwest corner room on the ground floor. Appellant testified at length as to the facts claimed by him to have transpired at the time of and prior to the shooting, showing the character and disposition of deceased and his conduct toward his wife and children.

The charge of the court was excepted to for its failure to submit the defensive theories relating to appellant's right to defend Mrs. Ross and her child. A special charge was asked and refused, which is as follows:

"Gentlemen of the Jury: You are instructed that the defendant had the legal right to protect or defend Maggie Ross or her child, or either of them against an unlawful assault on the part of John Ross. If, therefore, you believe from the evidence that the deceased tried to force an entrance into the room of Maggie Ross with the purpose of unlawfully assaulting said Maggie Ross or her child, or either of them, and that defendant knew of such unlawful purpose, or if it reasonably then and there so appeared to the defendant, taking into consideration his knowledge, if any, of the character and disposition of the deceased, then the defendant had the right to interfere and prevent deceased from entering said room or from making such an assault on Maggie Ross or said child, or either of them."

Appellant swore that soon after deceased came to his home on the night of the homicide, he inquired for his wife and was told by appellant that she was not feeling well and had retired early, whereupon deceased went to the door of his wife's bed room, kicked on it and called to her and told her if she did not open the door he would kill her; that fearing deceased would hurt his wife and son he took hold of deceased and tried to get him to not disturb his wife; that deceased drew a knife and told appellant that it was none of his busi-

ness; that deceased then went down a hall and into another room from which a door opened into his wife's bed room, which door however was also closed and locked; that he followed deceased and was watching from the hall-way; that as deceased was about to force said door, he observed appellant and with an oath demanded to know why appellant was following him and threatened to kill appellant; deceased then came toward appellant and picked up from a mantel a small bust of Scott and threw same at appellant striking him on the hand; that deceased then again threatened to kill appellant and drew his knife; appellant grabbed the arm of the hand in which the knife was and the two men scuffled around in the hall, jerked loose from each other and deceased went into the dark dining room behind which was a kitchen opening on a back porch on which porch was a shotgun; appellant said, believing that deceased was going to get this gun to kill him with, he ran into the southeast room of the house to a drawer in which was a pistol, got the pistol, came back out in the hall and fired into the dark dining room into which deceased had gone. As stated above, officers who arrived in a few minutes found deceased on the floor of this dining room, shot.

Examination of the charge discloses that nothing therein gives the jury any light upon the right, if any, of appellant to do anything to prevent any assault by deceased on Mrs. Ross. This, according to appellant's claim, led him to do and say those things which caused the assault by deceased with the bust, also the drawing of his knife, and induced belief on the part of appellant that deceased was purposing to continue the assault upon him by getting a gun and shooting him. Whether these things actually so transpired was for the jury under all the facts in evidence,—but for the purpose of determining the law applicable to the defensive theories the court could only look to the defensive testimony and be bound thereby.

The jury were called on to determine whether the shooting was upon malice, or under circumstances reducing to manslaughter, or in self-defense. What was done and said by the parties immediately before the shooting became its antecedents and may have created the mental attitude which would give character to the homicide as being upon malice, or upon sudden passion, or in self-defense. Whether one who embarks on a given enterprise be wrong or has some right on his side in the beginning, might give color to conflicting theories as to his subsequent acts and conduct. One who arms himself fearing danger and seeks an explanation, in a proper case has the right to have the jury told that the fact that he do so arm himself would not deprive him of his right of self-defense, else the fact that he went armed to where his adversary was, might of itself be given harmful effect by the jury.

Analysis of the requested charge above quoted indicates that its purpose was merely to inform the jury as to appellant's right to do

what he claims he did in the initial part of the transaction, i. e. to interfere and prevent deceased from entering the room of Mrs. Ross, provided appellant knew that the purpose of deceased was to assault her, or if it reasonably appeared to him from what occurred and from his knowledge of the character and disposition of the deceased, that such was his purpose. In the absence of some such instruction as that under discussion it is easy to see how appellant's admitted interference with the effort of deceased to get into his wife's room, might have been given harmful effect by the jury. Men, on the jury or off, are prone to look with ill-favor on acts of other men who meddle in the domestic affairs of others without right, and in debatable cases are apt to let the natural prejudice against such conduct turn the scale against the outsider. It seems to us that this is especially true in a case where the State places dependence on the theory of illicit relations between the accused and the woman in whose behalf he claims to have acted; or where it is asserted that there was a conspiracy between said woman and the accused to bring about the death of her husband. The requested charge does not seek to set forth any right of acquittal on the ground of defense of the woman and as we understand it is confined to an announcement of the right of appellant to prevent deceased from entering the room of Mrs. Ross if he knew or had a reasonable ground to believe that the purpose of deceased in such entry was to unlawfully assault her. To this extent we believe the charge should have so informed the jury and that in failing to so instruct them or to give the requested instruction there was error. What we have said is predicated upon the necessary assumption by the court that the accused was telling the truth in his narration of what occurred. The question as to whether he was in fact telling the truth and whether these facts correctly represented the transaction, was one for the jury's determination.

Appellant complains of the refusal to allow Uffie McLean, a niece of Mrs. Ross, to testify that before the killing she and appellant discussed with a lady whom they met at a beauty parlor, the fact of their engagement and advised with her as to their marriage. The pertinence of such testimony is urged on the ground that the fact of such engagement would shed light on the reasons which caused appellant to become an inmate of the Ross home, and to some extent combat the effect of the State's testimony and its theory that illicit relations between appellant and the wife of deceased influenced him in committing the homicide. We are referred to the trial court's qualification of the bill of exception presenting this complaint and are there referred to the statement of facts. From same we nowhere learn that appellant was engaged to Uffie McLean when he went to board at the Ross home. Both testified as witnesses and neither affirm such engagement. It does not appear from the testimony that appellant went to said home remotely influenced by any engagement.

There was no error in the rejection of the statements made by appellant and Uffie McLean concerning their engagement to the lady whom they saw at the beauty parlor. Miss McLean testified without objection that on January 26th she and appellant became engaged. Appellant also without objection testified that before this killing they became engaged. No effort was made by the State to prove statements made by either which in terms or effect were contradictory to their claim that they were engaged, nor are we able to agree with appellant that the State denied such engagement. As far as we learn from the facts the State may have asserted that the fact of such claimed engagement on January 26th formed some basis for belief on the part of appellant on February 4th following that he had a right to prevent deceased from entering the room occupied by Mrs. Ross. The rule discussed by the authorities cited by appellant in support of this contention is in nowise doubted or combated by us. One whose statements in evidence are attacked either by proof of other variant statements or by proof of facts suggesting that such testimony results from a corrupting influence, may be sustained by prior similar statements made before those at variance with his testimony or before the approach of the suggested corrupt influence. We are unable, however, to see any application of the rules laid down in these authorities to the facts of the instant case.

Complaint is made that certain testimony of one Ruiz was not allowed. Same appears to have been offered to show the friendly attitude of appellant toward the deceased and his intercession with Mrs. Ross to let deceased come to his home. Among other things, the bill states that Ruiz would swear that he went with Ross to the house and asked Mrs. Ross to let deceased come in and lie down, that he had a headache; that appellant took part in the conversation and advised and urged Mrs. Ross to let deceased in and interceded for him, and at the same time said to deceased, "Uncle John, I don't want you to come in and treat mama like you did the other day," and further said to Mr. Ross, "I don't want to see anything like that," and that Mr. Ross said, "No, no, I won't do nothing, I want to go in and lie down." That Mrs. Ross let deceased in the house and Ruiz went back to his home. A statement by appellant or Ruiz either, that appellant advised and urged Mrs. Ross to let Mr. Ross in and interceded for him, would plainly call for conclusions and opinions and not for facts which might have been admitted or rejected at the discretion of the trial court without serious effect. The statements attributed to appellant by Ruiz, as set out in the bill of exceptions and quoted above, do not seem to evidence any intercessory effort on his part with Mrs. Ross. We perceive no error in the rejection of testimony of such statements made by appellant.

97 T. C.—34.

For the purpose of showing the violent character of deceased and his treatment of his wife, appellant introduced the testimony of a Mr. Rogers who boarded at the Ross home about a year before this killing, and who testified that on the third night of his stay at the house he awoke about one o'clock a. m. and heard a man's loud voice cursing. Witness thought it a family row and went back to sleep. On cross-examination he testified to a conversation with Mrs. Ross next morning as follows:

"She stated, just asked me if I heard her husband that night when he came in, as near as I remember the conversation and I told her I did. And she said, 'Well, there is no use to be alarmed, because he is harmless' or something to that effect. I would not say positively just what the words she used, but I inferred from the remarks I need not be disturbed because probably it was a regular occurrence and was not unusual."

On re-direct examination this witness testified that Mrs. Ross said that Mr. Ross was staying out on the farm and was likely to come in at any time and would probably be intoxicated, and for witness to pay no attention to him. It is insisted that to put before the jury a statement from Mrs. Ross that deceased was harmless, was very hurtful to the defense herein. To attribute to witness the statement in terms that Mrs. Ross said her husband was harmless, is going beyond the record. The witness declined to affirm the exact language used by Mrs. Ross but stated that what was said by her was to the effect that what had taken place the night before was a regular occurrence and not unusual. Certainly, judged by this standard, the complaint is without merit.

It is contended by several bills of exception that statements made by deceased after the shooting, admitted as res gestae, were not admissible. Carlson, who came with the ambulance and rode in it with deceased to the hospital, testified to statements made by deceased on the way. The main point in such case would be the spontaneity or instinctiveness of such statements, in determining which we would take into consideration the time and other circumstances to a greater or less degree. Bradberry v. State, 22 Texas Crim. App., 278; Bronson v. State, 59 Texas Crim. Rep., 17. Statements to be res gestae need not be made at the same time if they reflect a continued expression of the facts surrounding the transaction expressing themselves through the party making the statements. McGee v. State, 31 Texas Crim. Rep., 74. As we can best arrive at it, from the testimony of the various witnesses, the time of the shooting was near 9 o'clock p. m. The ambulance was phoned for as soon as the officers reached the premises, which was from three to five minutes after the shooting, according to the testimony. Mr. Cook, driver of the ambulance, said that from the time he received the call to come to the home of de-

ceased, till he had him at the hospital, was fifteen or twenty minutes. So much for the time feature in determining the admissibility of the statements in the ambulance as res gestae. Deceased was shot through the body, the intestines being perforated in eight places and an artery pierced. Carlson said that deceased was bleeding on the way to the hospital and seemed to be in pain; that he would reach out with his hands for the wall of the ambulance, and repeated ten or fifteen times, "Oughtn't to shoot a man in the back." That he was shot in the back was not denied. From the standpoint of res gestae, we entertain no doubt of the admissibility of such statement.

Bill of exceptions No. 18 complains of the testimony of Sheriff Miller as to a statement made by deceased while on the operating table at the hospital. We have carefully scrutinized the testimony as to the time element involved in determining the admissibility of this statement and think it to have been made well within two hours after the shooting. That the deceased was suffering from a mortal wound and in great pain, is clear. In Freeman v. State, 91 Texas Crim. Rep., 411; 239 S. W., Rep., 969, we cited many authorities in support of the following proposition:

"Many authorities hold that when a condition of suffering exists from the infliction of the injury to the making of the statement in a given case it might extend far enough to preclude premeditation and in cases of this kind we have declined to be limited to any specific time. Tooney v. State, 8 Texas App., 459; Stagner v. State, 9 Texas App., 441; Fulcher v. State, 28 Texas App., 471, 13 S. W., 750; Lewis v. State, 29 Texas App., 201, 15 S. W., 642, 25 Am. St. Rep.. 720; Castillo v. State, 31 Texas Crim. Rep., 145, 19 S. W., 892, 37 Am. St. Rep., 794; Moore v. State, 31 Texas Crim. Rep., 236. 20 S. W., 563; King v. State, 34 Texas Crim. Rep., 237, 29 S. W., 1086; Freeman v. State, 40 Texas Crim. Rep., 545, 46 S. W., 641, 51 S. W.. 230; Chapman v. State, 43 Texas Crim. Rep., 328, 65 S. W., 1098, 96 Am. St. Rep., 874."

We think the statement of Sheriff Miller res gestae under this rule and the facts above stated. In our view, one shot through the body near 9 o'clock p. m., as this man was, unable to move himself or speak audibly when officers reached him within probably ten minutes after the shooting, suffering as he is carried to a hospital so that he repeats some phrase over and over many times, placed on an operating table where he was operated on at about 10:30 or 11 o'clock, and while still suffering makes a statement otherwise admissible, which is admitted by the trial court on the ground of res gestae, we should not hold it reversible error, if erroneous at all. Complaint is also directed at these statements upon the ground that they were not statements of any fact and were no more than an opinion or conclusion of deceased. In Clark v. State, 56 Texas Crim. Rep., 293, we held admissible as a res gestate statement that one said that he shot in self-defense. That

"He shot me for nothing," and in "cold blood," etc., have often been held admissible by this court. Numerous authorities are collated to this effect in the opinion in Davis v. State, 83 Texas Crim. Rep., 539, 204 S. W. Rep., 655. See also Woods v. State, 87 Texas Crim. Rep., 354, 221 S. W. Rep., 278; Finley v. State, 92 Texas Crim. Rep., 543; 244 S. W. Rep., 526; Couch v. State, 93 Texas Crim. Rep., 27. In Sims v. State, 36 Texas Crim. Rep., 165, we held admissible a statement of deceased as follows: "Sims ought not to have shot me." We perceive no error in the admission of the statements from either angle of objection.

Appellant objected to the statement of deceased as testified to by officer Cloud that shortly after the shooting and while deceased was lying on the floor of the room where he was shot, he said: "I guess I am to blame, they don't want me here." The entire statement thus made is here presented as erroneous in one bill of exceptions. It seems well settled that in case there be matter partly admissible and partly not and objection is made to the whole and it is so passed upon by the trial court, we will hold such a bill to present no error. Martin v. State, 80 Texas Crim. Rep., 275, 189 S. W. Rep., 266, and authorities there collated. Manifestly that part of said statement in which deceased said: "I guess I am to blame" would not be held objectionable. However, we are not inclined to think any part of said statement objectionable. If we comprehend this entire record from beginning to end it abounds with incontestable evidence of the fact that deceased was not wanted at his home. Appellant testified that he had reminded deceased that he had been enjoined from coming to the premises. Appellant also admitted that on the afternoon of the homicide and not very long before same occurred, he and Mrs. Ross, upon seeing deceased on the street, came together to the courthouse and interviewed the officers with a view of having them prevent deceased from coming to the house, and the record reflects the fact that appellant said at the time to the officers that if deceased came to the house that night there would be trouble. We further observe that as far as we can gather from the record deceased was permitted to lie in the dark dining room where he was shot by appellant until after the officers arrived upon the scene. They went into the dining room and turned on the light and found him lying on the floor shot through the back. They procured for him a pillow and he said to one of them that he wanted to speak to his wife if he was going to die, and one of the officers called Mrs. Ross and she came and stooped over him and said, "Honey, you oughn't have done it" and raised up and walked away, and it was after this that deceased made the statement here complained of. It was objected to as an opinion expressed by deceased that contained no fact. Mr. Branch in Sec. 131 of his Annotated P. C. refers to many authorities as supporting the proposition

that an opinion, in so far as it consists of a statement of an effect produced upon the mind of the party uttering it, becomes primary evidence, and hence admissible whenever the conditions are such as that they cannot be reproduced and made palpable in the concrete. As a matter of course we cannot know all the things that operated upon the mind of the deceased which induced him to make the statement. Apparently he had been shot within a few minutes after entering his own home, and had then been left by himself lying in his own dining room without light or assistance of any kind until the officers arrived. When his wife came in answer to a request from him to talk to her, she reproved him for something that he had done and left him. He knew that he had been enjoined from coming to the premises. Many other facts appear in testimony, among which we observe that appellant, in answering a question on cross-examination in reference to deceased, stated, "It was not his household, he had been run away." We do not think the bill of exceptions presents any error. The statement attributed to deceased was the expression of what was on his mind as the effect of the circumstances, and was a shorthand rendering of facts.

The testimony of officer Stubbs that when he told appellant to put on his clothes and go to the station and the latter went into a room to dress, Mrs. Ross made two efforts to get into the room where appellant was, seems well within the rule governing res gestae acts and statements of co-conspirators. These rules seem to admit testimony of acts and statements of co-conspirators after the consummation of the conspiracy if connected therewith closely enough to be res gestae. Phelps v. State, 15 Texas Crim. App., 55; Tillery v. State, 24 Texas Crim. App., 273; Weathersby v. State, 29 Texas Crim. App., 307; Martin v. State, 44 Texas Crim. Rep., 281; Eggleston v. State, 59 Texas Crim. Rep., 551.

We deem the testimony relative to the acts and conduct of appellant and Mrs. Ross, at the office of the United States Marshal, and at the jail subsequently, and that she called him "sweetheart" at her home on the night of the shooting, admissible as circumstances showing and tending to support the theory of a conspiracy between appellant and Mrs. Ross. Mrs. Ross had become involved and owed penalties to the Federal government for violations of the liquor laws. The extent of this obligation was considerable. It was shown that shortly after the killing she took into her possession and disposed of considerable property. The testimony of the appellant as given upon the stand is replete with numerous details of matters which would not ordinarily seem to be related by a landlady to a boarder in her home. The acts and conduct of appellant and Mrs. Ross in the premises were such as to tend to support said theory. In such case we think it proper for the State to search every legitimate avenue to ascertain the motive

and to turn on all the light possible upon the relations of the parties involved.

We have carefully gone through the able brief of appellant's counsel and his supplementary brief, and have considered at length the various contentions made, as well as the brief for the State, and are constrained to believe the error of the charge mentioned such as to call for reversal, and it is so ordered.

*Reversed and remanded.*

ON REHEARING.

June 4, 1924.

MORROW, PRESIDING JUDGE.—In deciding the point upon which the reversal is based in the original opinion, this court has not done violence to or extended the practice concerning the law applicable to one who, for the purpose of an explanation, seeks another while armed with a pistol or other deadly weapon. That one by doing so does not necessarily forfeit the right of self-defense is declared in Shannon's case, 35 Texas Crim. Rep., 2, and many others following it. That under such circumstances the duty does not devolve upon the trial court to instruct the jury that by such conduct the right of self-defense is not forfeited, except in instances where the facts justify and the court gives a charge on the law of provoking the difficulty, was decided in Williford v. State, 38 Texas Crim. Rep. 395.

The announcement in the present case applies to another principle, namely, that one may take life to prevent the murder of another person; that in doing so the law throws around him the same shield as though he were defending himself. In the statute, it is said: "Homicide is permitted by law when inflicted for the purpose of preventing the offense of murder, etc." (Art. 1105, P. C.)

The circumstances under which one may act are defined in the same statute, Article 1105, P. C.

In the books are many cases decided by this court giving effect to the statute. See Glover v. State, 33 Texas Crim. Rep., 224; Vernon's Texas Crim. Stat., Vol. 2, p. 648, note 10.

When there is evidence from which the jury might draw the inference that one charged with homicide or assault acted in the defense of another, the obligation rests upon the trial court, upon demand of the accused, to give to the jury a charge upon that subject, and this principle prevails notwithstanding the appellant may testify that he acted in his own defense. See Bonner v. State, 29 Texas Crim. App., 223; Sowell v. State, 32 Texas Crim. Rep., 482; Carden v. State, 62 Texas Crim. Rep., 607; Knight v. State, 84 Texas Crim. Rep., 397; Voight v. State, 53 Texas Crim. Rep., 268; Medina v. State, 87 Texas Crim. Rep., 81.

In the present case, according to the theory advanced by the appellant, resting upon his testimony, the initial step taken by him in the difficulty which culminated in the death of the deceased was the appellant's interposition against the execution of the threat by the deceased to kill his wife. This is made plain in the original opinion. The propriety of, and upon demand, the necessity for instructing the jury in appropriate language that the law gave the appellant the right to prevent the deceased from killing his wife, to the writer, seems obvious. Without such an instruction, it would have been not unnatural for the jury to have assumed, taking into account the entire situation developed by the record, that in interfering with the deceased when he appeared to be endeavoring to enter the room of his wife, after he had threatened to kill her, the appellant was in the wrong and a meddler in the affairs of another.

In the charge on the right to defend himself, the jury was instructed that the appellant had the right to resist an unlawful attack which, viewed from his standpoint, put him in danger of death or serious bodily injury. The evidence which called for a charge upon his right to defend himself was that in which he claimed that he was attacked by the deceased in connection with the appellant's interference with the deceased in his effort to force himself into the room of his wife immediately after he had threatened to kill her. Whether the assault by the deceased which the appellant described was lawful or unlawful, or appeared to him to be unlawful, would have been made much plainer to the jury if they had been told that in attempting to prevent the deceased from assaulting his wife, the appellant was within his rights.

The appellant insists that the opinion heretofore rendered should be modified in several respects. Among others, he takes the position that in upholding the action of the trial court in excluding the testimony of Uffie McClean to the effect that she and the appellant, in the presence of a lady in the city of Austin, talked about a previous engagement, this court was in error. The fact that they were engaged to be married prior to the homicide was in evidence. Appellant insists that the excluded testimony should have been received because the State, by innuendo, had attacked the veracity of the witness Uffie McClean, by whom the appellant had proved that the engagement existed. The rule under which a witness may be supported by prior consistent statements is not obscure. It is stated in these words:

"Where the State's case is that the defendant's witness testified under corrupt motives, or where the testimony goes to charge the witness with a recent fabrication of his testimony, it is error to exclude proof of similar statements in consonance with the testimony of the witness made before any motive existed to make a false state-

ment about the matter." (Branch's Ann. Texas. P. C., Sec. 183, subdivision 4.)   See also Taylor v. State, 87 Texas Crim. Rep., 331.

It is our conception of the record that it does not show an attack on the testimony of Miss McClean warranting the introduction of the proffered testimony. If there was an attack upon her, the details are not given, and we are not in a position to determine from the conclusions stated in the bill that in rejecting the testimony the learned trial judge was in error.

Concerning the proffered testimony of the witness Ruiz that the appellant "advised and urged Mrs. Ross to let Mr. Ross in and interceded for him, saying: "Uncle John, I don't want you to come in and treat mamma like you did the other day," and Ross' reply: "No, I won't do anything; I want to go in and lie down," we are again obliged to confess our inability to discern from the bill that error was committed. If all the words that were used were those which have been quoted in the opinion and which were set out in the bill, we fail to perceive their materiality.  They appear admonitions to Ross rather than a request of his wife. If the appellant said anything to Mrs. Ross by way of urging her to permit the deceased to enter the house, the words are not revealed by the bill. From this silence of the bill touching other words used, the assumption on appeal is justified that those set forth in the bill constitute all that are relied upon by the appellant.

Relative to the testimony of the witness Rogers reproducing a part of the conversation between himself and Mrs. Ross, to which reference is made in the original opinion, it is the claim on the part of the State that the evidence complained of was received with the consent of the appellant's counsel. This was denied. The learned trial judge does not seem to have settled the controversy further than to attach to the bill of exceptions some twenty pages of the stenographer's notes, and from this we infer that in receiving the testimony, it was deemed by the learned trial judge either germane to the direct examination or admitted with the consent of the accused and his counsel. Upon the original hearing, our attention was not directed to the manner in which the bill was qualified. It will doubtless not present itself in the same manner upon another trial, and a discussion or analysis of the qualification and the bill now seems unnecessary, further than to say that as original testimony the declaration would not be admissible. Whether it would be proper on cross-examination depends upon the scope of the direct examination of the witness on another trial.

In his motion for rehearing, appellant assails the upholding of the action of the trial court in receiving in evidence certain declarations of the deceased. The declarations are such as would be excluded under the rule against hearsay unless they come within the scope of

the exception to that rule known as *res gestae*. A general statement of the rule of res gestae is found in Greenleaf on Evidence, Vol. 1, 13th Ed., Sec. 108, in these words:

"There are *other declarations* which are admitted as original evidence, being distinguished from hearsay by their connection with the principal fact under investigation. The affairs of men consist of a complication of circumstances so intimately interwoven as to be hardly separable from each other. Each owes its birth to some preceding circumstances, and. in its turn, becomes the prolific parent of others; and each. during its existence, has its inseparable attributes, and its kindred facts, materially affecting its character, and essential to be known in order to a right understanding of its nature. These surrounding circumstances, constituting parts of the *res gestae*, may always be shown to the jury, along with the principal fact; and their admissibility is determined by the judge, according to the degree of their relation to that fact, and in the exercise of his sound discretion; *it being extremely difficult, if not impossible, to bring this class of cases within the limits of a more particular description.*"

In Section 110, the author adds:

"It is to be observed. that, where declarations offered in evidence are merely *narrative of a past occurrence,* they cannot be received as proof of the existence of such occurrence. They must be *concomitant* with the principal act. and so connected with it as to· be regarded as the mere result and consequence of the coexisting motives. in order to form a proper criterion for directing the judgment which is to be formed upon the whole conduct."

Mr. Wharton. in his work on Crim. Ev., Vol. 1, Sec. 262, defines it thus:

"Res gestae are events speaking for themselves, through the instinctive words and acts of participants, but are not the words and acts of participants when narrating the events. What is said or done by participants under the immediate spur of a transaction becomes thus part of the transaction because it is then the transaction that thus speaks. In such cases it is not necessary to examine as witnesses the persons who, as participators in the transaction, thus instinctively spoke or acted. What they did or said is *res gestae;* it is a part of the transaction itself.

As long as the transaction continues, so long do acts and deeds emanating from it become part of it, so that in describing it in a court of justice they can be detailed.

The distinguishing question is. Is the evidence offered that of the event speaking through the participants? If so, what is thus said can be introduced without calling those who said it. Is the evidence offered that of observers speaking about the event? If so, such observers must be called to testify.

Nor are there any limits of time within which the *res gestae* can be arbitrarily confined. They vary in fact with each particular case.

Declarations claimed to be a part of the *res gestae* may precede, accompany, or follow the transaction to which they relate. But it is only when they precede, accompany, or follow the transaction so as to be wrought up in it and emanate from it, that they can be rightfully regarded as excepted from the rule which excludes hearsay.

It is the universal rule that narratives of the transaction after it has occurred are inadmissible as *res gestae,* and not admissible at all unless as admissions by the party charged; on the same principle declarations prior to the transaction are excluded.''

Examples of the construction placed upon the rule are too numerous to mention. It may be stated, however, that the tendency of the courts is to liberalize rather than to restrict the rule, and this is particularly true of the Court of Criminal Appeals. Touching the practice in this court, it is said in Wharton's Crim. Ev., Vol. 1, p. 491, note:

"The Court of Criminal Appeals of Texas has so far departed from the definition in its admission of all facts. circumstances, statements, occurrences, before, accompanying, and after. that. as illustrating the rule, the cases would be of no value as to the limits set for *res gestae.* *** and its practice as to *res gestae* is readily explained from the fact that the Texas Court of Criminal Appeals always considers the entire record, weighing, analyzing, and thoroughly digesting all the evidence before applying the law to the case in hand, and hence admissions as *res gestae* in the Texas courts are not so harmful an application of the rules of evidence as in courts less painstaking with examination of records, and who dwell more upon the strict rules of law.''

One of the earliest pieces of legislation in this State was the enactment of a statute, which is still in force, in these words:

The common law of England as now practiced and understood shall, in its application to evidence, be followed and practiced by the courts of this State, so far as the same may not be inconsistent with this title or any other law.'' (R. S. Art. 3687.)

See also Art. 5492, R. S., adopting the common law of England.

The res gestae rule, therefore, so far as pertains to its status in Texas, is statutory, and it is not within the discretion of the courts to either repeal or modify it. It is their duty to construe and apply it. The above quotations from textwriters illustrate, and an examination of the reports would emphasize that in its application, the rule of *res gestae* is most difficult. The rule is not so rigid or well defined as could demand absolute accuracy in its construction either by the trial or the reviewing courts. Many instances arise upon particular facts in which it is impossible to demonstrate whether the proffered evidence is or is not within the scope of the rule of res

*gestae.* Taking note of these conditions, that there is some variety of opinion reflected by the decisions is not a subject of wonder and cannot be justly regard as changing the rule. It cannot be denied that the decisions cannot all be harmonized either with the rule or with each other. Notwithstanding this, the rule, as above stated, is statutory, and so far as its application may be ascertained upon the examination of each particular record, it is incumbent upon the courts to follow it. On appeal, however, its lack of rigidity and the difficulty of ascertaining its limits render it proper that the decision of the trial court touching its application should be given great weight.

Opinions are not acceptable under the rule, and at times the distinction between an opinion and a shorthand rendition of the facts is almost indistinguishable. Some illustrations are found in the original opinion in this case and in McDougal's case, 81 Texas Crim. Rep., 179.

The declaration of the deceased Ross: "I guess I am to blame; they don't want me here," made under the conditions portrayed in the original opinion, as shown by the record, was, in the judgment of the writer, not an opinion but a statement of fact admissible under the rule of res gestae.

The exclamation of the deceased while on the way to the hospital: "oughtn't shoot a man in the back", seems to have been properly received under the res gestae rule. His declaration made at the sanitarium: "They had no right to shoot me", would seem, in view of the antecedent events and conditions prevailing at the time, not part of the res gestae.

In discussing the declarations in question, we have had in mind another trial of the appellant, and do not intend to indicate that this court feels so secure in its opinion that some of the declarations should have been rejected, as would necessarily call for a reversal.

Upon the grounds stated in the original opinion, a new trial is made necessary.

Much of this opinion is responsive to the appellant's motion for a modification of the original opinion.

The State's motion for rehearing is overruled.

*Overruled.*