# FEBRUARY, 1925.

### HOMER FLEMING V. THE STATE.

No. 8958. · Delivered February 18, 1925.

Rehearing denied State June 24, 1925.

**1.—Murder—Dying Declarations—Impeachment of—Improperly Excluded.**

Where the state had introduced the dying declarations of the deceased, the defendant offered in evidence other statements made by his wife, the deceased, made prior to the dying declarations introduced by the state. Whether the declarations, which appellant offered to prove were shown to have been made in the consciousness of inevitable death, or not, it was error to exclude them. Following Felder's case, 23 Tex. Crim. App. 488. Couch v. State, 245 S. W. 596.

**2.—Same—Continued.**

Whether the testimony was admissible as a dying declaration, or not, it was admissible to contradict the State's testimony embraced in the dying declarations which had previously been introduced. Quoting Chief Justice Field as set out in Felder's case: "There would be no justice, therefore in any rule which would deprive the accused of the right to impeach the credit of the deceased, by proof of his having made contradictory statements as to the homicide, and its cause."

**3.—Same—Continued.**

And not only do we believe that the testimony was admissible, as contradictory of deceased's dying .declarations, but under the facts, as disclosed in the record we are inclined to the view that it was also admissible under the rule of *res gestae.*

**4.—Same—Declarations of Defendant—Improperly Excluded—Res Gestae.**

The declarations of appel'ant to his brother, at the scene of the homicide, while he was ministering to his wife, some fifteen minutes after the homicide, were improperly excluded, as not coming within the rule of *res gestae.* Following Simpkins v. State, 251 S. W. 1084, and other cases cited.

**5.—Same—Charge of Court—Self Defense—Restrictive and Erroneous.**

Where the learned trial judge in submitting the defensive issue of self-defense, instructed the jury that appellant must resort to all reasonable means for the prevention of the threatened injury to him except to retreat, such charge was not warranted under the facts presented in evidence by appellant. It presented to the jury a theory that does not arise from the evidence. Following Best v. State, 58 Tex. Crim. Rep. 327 and other cases.

**6.—Same—Charge of Court—On Intent to Kill—Presumed from Deadly Weapon.**

Where there is no evidence in the case that the weapon in the hands of the deceased, that appellant contends he was being assaulted with, was a deadly weapon, it was not error for the court to fail to instruct on the presumption to kill, embraced in Art. 1105 of the penal code.

ON REHEARING

**7.—Same—Impeaching Dying Declarations—Proof of Contradictory State-ments—Admissible.**

The pith of our opinion, and the gist of our discussion, intended to set forth that the state having introduced the dying declarations of deceased, as indicating an intentional killing on the part of appellant, he had the right to prove other declarations of the deceased showing the shooting was accidental. In other words a dying declaration may be attacked, or impeached by showing other statements of declarant of different import.  See authorities cited.

Appeal from the District Court of Llano County.  Tried below before the Hon. J. H. McLean, Judge.

Appeal from a conviction of murder; penalty, confinement in the penitentiary for life.

The opinion states the case.

*Coke R. Stevenson, M. E. Blackburn, E. L. Dalrymple, F. J. Johnson* and *Watson & Chapin,* for appellant.

*Tom Garrard,* State's Attorney, and *Grover C. Morris,* Assistant State's Attorney, for the State.

MORROW, PRESIDING JUDGE.—The offense is murder; punishment fixed at confinement in the penitentiary for life.

The facts, to some extent, are embraced in the opinion of this court in Ex parte Fleming, 97 Texas Crim. Rep. 305.

Annie Fleming, wife of the appellant, received a gunshot wound from which she died.

From the dying declaration of the deceased, introduced by the State, we take the following:

"I got my things fixed up then so I could go down to mama's. So after dinner he fooled around.  I was not going to leave until after he left.  So he took his shoes down to the car and fooled around there and then started back, and I saw him talk to Mr. Anderson awhile.  So he came into the dining room and tried to get Sonny Boy to go over to Oll's with him; he wouldn't go, *and he tried to force him to go.*  And Son told him he would go some other time; that he wanted to go down to Uncle Bill's with me.  So Sonny Boy kept coming into my room, and grandpa was sitting in his big chair, and I told Homer, so he was standing right there in that door, and I told him that I was going to mam's and would be gone several days. I saw him pull his pistol out, and I don't know, I believe he fired one shot at grandpa.  I don't know.  So I had an old piece of iron there in my room, and I grabbed it and tried to hit the pistol out of his hand, and Son just a screaming right at my heels.  And I saw the fire of the pistol, and he hit me and I fell right there on that rug by the dresser.  And Mrs. Anderson and grandpa managed to get me up on the bed some way.  And I told grandpa to phone for the doctor, and I think Homer phoned for the doctor."

The tragedy took place at the home of O. B. Fleming, father of the appellant, at which it seems the appellant and his wife resided though they did not live together as husband and wife. They had a son, a small boy, who, according to the appellant's testimony, it had been his custom to take with him on occasions.. On the day preceding the homicide, appellant and his wife had engaged in a quarrel about the whipping of a dog, and the father of the appellant had interposed. He and the appellant engaged in a quarrel. Immediately before the homicide, the appellant's father was sitting by the fire with a knife in his hand which he was using to open pecans. Appellant intending to spend the night with his brother, asked the boy if he would like to go with him. Upon the boy indicating that he would, the father became angry, rose to his feet with the knife in his hand, and said that the boy should not go. According to the appellant, hot words followed, and his father, who was a vigorous and dangerous man, advanced upon the appellant with a knife in his hand, endeavoring to strike him. Appellant retreated, holding his pistol in his hand, and finally fired a shot for the purpose of deterring him but not with the intention of killing him. Appellant was engaged in backing out of the room and did not see the wife at the time he fired at his father, but as he was backing out, she advanced upon him with an auger in her hand. According to the appellant, ''She rushed up behind father with that auger and began striking at me. She come up to the right of my father and was striking at me with that auger, and when they come up I backed then into the room—backing away from both of them. They were both right at me and father was cutting at me with this knife.'' The appellant's wife struck him across the sleeves a time or two, and the blows were knocked off. Appellant presented his gun at his father and commanded him to stop. She struck him and tried to knock the gun out of his hand, and also grabbed his hand and pushed it over her shoulder when the gun was discharged and she fell on the floor. He had not intention of shooting her at that time; neither did he have any idea of killing her. He was using the gun in order to prevent his father from cutting him with the knife. After his wife fell, he 'phoned for a doctor and did what he could to relieve her suffering. He also 'phoned for his brother. He was crying, broken down and scared to death.

The knife which the appellant claims was used by his father and the piece of iron which he claims was in the possession of his wife, were introduced in evidence.

It appears from a bill of exceptions that after the appellant had telephoned for a doctor and for his brother, but before either of them arrived and at a time when he was in tears and under excitement, he said to his wife: ''You know that it was an accident and I did not intend to shoot you'', to which she replied: ''I know it,

and I forgive you and want you to forgive me.'' The exclusion of this testimony is made the subject of complaint.

Mrs. Nora Anderson, who was present in the house at the time, described the encounter in substantial accord with the appellant's version and testified that immediately after she was wounded, the deceased was placed in bed by the witness and O. B. Fleming, and the deceased said: "Mrs. Anderson, protect my child. I don't care for him taking the boy.'' The witness said that deceased then talked to Mr. Fleming and stated that she was going to die; that she wanted Mr. and Mrs. Huffman to have the boy. The doctor who arrived a short time subsequent to this conversation said that upon his arrival Mrs. Fleming began to talk. She was excited and was calling for water. She said: "I am dying. Homer shot me in the stomach and I am going to die. The doctor said that she was suffering intensely at that time.

In qualifying the bill the judge adverts to the fact that the conversation took place before the arrival of Doctor Stone and Mrs. Brown and that only Mrs. Anderson and Homer Fleming had testified to facts showing that the deceased was conscious of the approaching death. The court also said that Ollie Fleming may possibly have arrived; that he testified that he did not hear the deceased say that she was going to die. If we comprehend the record, the time that the declaration of the deceased was made was before the arrival of Ollie Fleming. Assuming that it was not, however, the testimony of the appellant and Mrs. Anderson was to the effect that the deceased declared that she was going to die, taken in connection with her desperate condition, would at least prima facie establish a predicate which would require the receipt in evidence of the dying declaration of the deceased at that time. See Underhill on Crim. Ev., Sec. 179.

Mrs. Brown, who arrived soon after the tragedy as did Doctor Stone, testified that the deceased made declarations showing that she was conscious of the impending death, and upon their testimony, at least in part, the dying declaration which we have quoted above, was received in evidence against the appellant. Whether the testimony was admissible as a dying declaration or not, it was admissible to contradict the State's testimony embraced in the dying declaration which had previously been introduced. A dying declaration may be contradicted by the declarant's statement or otherwise to the same effect as the testimony of a witness. Bishop's New Crim. Proc., Vol. 2, p. 1033, sec. 1209. A dying declaration is hearsay but is received in evidence by reason of necessity in the case. The conditions under which it is made preclude cross-examination and dispense with the necessity of an oath. The reasoning and authority upon which the practice is founded is stated by Judge Hurt of this court in Felder's case, 23 Texas Crim. App. 488, in which is also

found a quotation from the language of Chief Justice Field, concluding with this statement:

"There would be no justice, therefore, in any rule which would deprive the accused of the right to impeach the credit of the deceased by proof of his having made contradictory statements as to the homicide and its cause."

The authorities supporting these announcements are numerous and harmonious. See Couch v. State, 245 S. W. Rep. 595; Clark v. State, 56 Texas Crim. Rep. 293; Davis v. State, 83 Texas Crim. Rep. 539.

We will add, however, that we are inclined to the view that the testimony mentioned was also admissible under the rule of res gestae.

The use of the words "and he tried to force him to go" in the written dying declaration, we think, were not improperly received. Considered in the light of the context, we think they were classified as a shorthand rendition of the facts.

In Bill of Exceptions No. 2, complaint is made of the refusal of the court to receive in evidence the declaration of the appellant, made to his brother Ol Fleming. From the bill as qualified, it appears that after his wife was shot, she was put on the bed by the appellant's father and Mrs. Anderson, who were in the house at the time the shot was fired. Deceased said: "I am very sick; I am going to die; 'phone for the doctor." Appellant asked her: "What doctor", and she said: "Doctor Stone." Appellant after telephoning for the doctor, immediately telephoned for his brother, Ol Fleming. He was crying at the time, broken down, scared grieved and excited. He told Ol Fleming to come over at once, and he arrived in a very short time, not over fifteen minutes. Appellant in the meantime was building fires and heating towels for his wife. Observing his brother, the appellant walked out and met him. He said he did not know how long it took to get the doctor on the telephone, but supposed that it was not longer than five minutes. Appellant testified that after telephoning for his brother, he said nothing to any one until the arrival of his brother; that he busied himself in the meantime trying to save his wife's life.

Ol Fleming testified that upon receiving the message, he was two and three-fourths miles distant from the home of the deceased; that he rode his horse from a gallop to as fast as the horse could go, reaching the home of the deceased in ten or fifteen minutes; that upon approaching the house, he met the appellant who was crying and very much excited, who told him what had occurred. Ol Fleming would have testified that his brother said to him in substance that O. B. Fleming was coming after him with a knife and that Annie Fleming had an old auger; that he was trying to get his father to stop and Annie Fleming was hitting at him and trying to hit the pistol or him and knocked his hand down and the pistol accidentally went

off and shot her. This testimony was offered as res gestae and excluded as not coming within that rule. In refusing to receive it, we believe the learned trial judge fell into error. Simpkins v. State, 251 S. W. Rep. 1084; Davis v. State, 255 S. W. Rep. 1112; Holman v. State, 243 S. W. Rep. 1093; Gillespie v. State, 190 S. W. Rep. 148, Craig v. State, 30 Texas Crim. Rep. 621.

Paragraph 4 of the court's charge reads thus:

''1. The law also accords to a person the right to act in his own necessary self-defense against any other unlawful and violent attack, though it may not appear to him at the time, that he was in danger of losing his life, or of sustaining serious bodily injury; *but, in such cases, he must resort to all other reasonable and available means for the prevention of the threatened injury, except to retreat, before he would be justified, under the law, in killing, or inflicting serious bodily injury upon the party making such attack, and then only when such attacking party, or parties, is in the very act of making such unlawful attack.*''

The propriety of embracing in the charge the language italicized is criticized by an exception duly reserved at the time and properly brought forward for review. In our opinion, the criticism is a just one. The assault against which the appellant was defending, according to his testimony, was one in which his father, a violent and dangerous man, was attacking with an open knife and endeavoring to strike, appellant at the time retreating. We perceive nothing in the record which would make appropriate a charge to the effect that the appellant must resort to every other available and reasonable means for the prevention of the injury except to retreat. It presented to the jury a theory that does not arise from the evidence. Best v. State, 58 Texas Crim. Rep. 327; Petty v. State, 216 S. W. Rep. 867; Britton v. State, 253 S. W. Rep. 519; Schutz v. State, 257 S. W. Rep. 880.

The same vice is found in the fifth paragraph of the court's charge.

The complaint of the manner in which the theory of accidental shooting was submitted not having been raised other than by the motion for new trial, it is not properly before this court.

The record is silent as to whether the weapons used by his adversaries were of a deadly character, hence, the failure to instruct on the presumption of intent to kill, embraced in Article 1106 of the Penal Code, is not error.

Appellant requested an instruction upon his right to defend against more than one assailant. Upon another trial, upon like evidence, this issue should be submitted.

Because of the errors pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—We discussed the admissibility of the offered statement of deceased set out in bill of exceptions No. 5, wherein it is made to appear that after the shooting, appellant said to deceased, "You know that it was an accident and I didn't intend to shoot you", to which deceased replied, "I know it and I forgive you and want you to forgive me." We did not discuss the matter with any view of definitely determining the admissibility of the statement of deceased as a dying declaration, or as res gestae; nor was our attention called to the form of the question or statement put to deceased by appellant as a predicate to what she replied, which might be invoked against its admissibility if her statement had been offered as a dying declaration or as res gestae. The pith of our opinion, and the gist of our discussion, intended to set forth that the State having introduced the dying declaration of deceased as indicating an intentional killing on the part of appellant, he had the right to prove other declarations of deceased showing that the shooting was accidental. In other words, a dying declaration may be attacked or impeached by showing other statements of the declarant of different import. Felder v. State, 23 Texas Crim. App. 488; Hamblin v. State, 34 Texas Crim. Rep. 385; Phillips v. State, 50 Texas Crim. Rep. 129; Herd v. State, 43 Texas Crim. Rep. 575. If one whose dying declarations are admitted in evidence has at other times made statements contradictory to such testimony,—under the authorities cited and others the contrary declarations are provable, and in such case similar supporting statements made by the deceased might be held admissible under all the rules.

The State also vigorously combats the correctness of our holding admissible as res gestae the statement made by appellant to his brother shortly after the shooting. The objection to said testimony made then, and appearing in the qualification of the learned trial judge, and urged in argument before us, seems of more cogence as affecting the truth of whether such statement was made, than as showing it not admissible. That appellant called a doctor before he called his brother and said nothing to the doctor about the manner or surroundings of the killing, would hardly seem to suffice as a reason for our holding the statement later made to his brother not res gestae. No explanation as to the why or wherefore of the shooting would seem necessary in calling a doctor, and while that fact might be usable in argument as against the probability of the subsequent narration to the brother being made, it could have no weight with us, who are only called on to determine whether or not the offered statement made to the brother was admissible under the ordinary rules governing res gestae. We have carefully examined the facts

as indicated in our original opinion and are unable to say that the statement as offered was not res gestae. The rule has application both for the State and the accused, and appears to be impossible of exact definition, but must be invoked upon the fact of the particular case as it arises.

Not being able to agree with the State, we are of opinion the motion for rehearing should be overruled, and it is so ordered.

*Overruled.*