## J. D. GLOVER V. THE STATE.

No. 16224.   Delivered January 10, 1934.
Rehearing Denied April 4, 1934.

The opinion states the case.

*J. E. Wheat* and *J. E. Sturrock*, both of Woodville, and *R. M. Briggs*, of Kountze, for appellant.

*Lloyd W. Davidson*, State's Attorney, of Austin, for the State.

MORROW, PRESIDING JUDGE.—Murder is the offense; penalty assessed at confinement in the penitentiary for twenty-three years.

The deceased, George K. Gibbs, conducted a printing establishment in Woodville, Texas, and resided in the suburbs of the town. The two sons of the deceased, who were fourteen and nineteen years of age, worked in the printing office. An incident took place in which, as viewed by the younger son, persons not directly connected with the present offense, undertook to drive their automobile over the boy while he was riding on his bicycle. An altercation took place in which, according to the testimony, the aggressors threw a rock through a win-

dow in the deceased's printing office. The two boys went in an automobile to the home of the deceased and reported to him the circumstances of the affair mentioned. The deceased and his two sons then went to the printing office in their automobile, the deceased being armed at the time. There was conflicting evidence to the effect that the deceased used violent language and that his conduct was such as might have justified a prosecution for carrying a pistol or for disturbing the peace. The deceased went to his printing office without any altercation occurring. He was accompanied by his two sons and followed by Mr. Fuller, a neighbor. A few moments after the deceased had entered his office, the appellant appeared at the door and hollered, "Come here, old man." Immediately upon entering the door the appellant fired three shots into the body of the deceased, thereby killing him at once.

The elder son of the deceased testified to the above, as did likewise Mr. Fuller. The elder Gibbs boy further testified that when the appellant hollered, "Come here, old man," the deceased said, "Just a minute," and reached for his glasses which he carried in his pocket. The deceased said, "Let me get my glasses," and about a second thereafter the appellant fired the shots. As the appellant entered the building, he seized the younger son of the deceased and used him as a shield for his protection while he was shooting. The shots were fired at a distance of about eight feet. After the shooting the sons engaged in struggle with the appellant over the possession of his pistol until they reached the door. The appellant and the elder son continued the struggle out into the street and to the edge of what they described as a "bluff." At this point the elder son observed the absence of his brother, abandoned the scuffle and ran into the house to his father. Appellant also re-entered the building, and his conduct, as described by the elder Gibbs' boy, was as follows:

"My brother was kneeled down in my daddy's face trying to get him to speak. * * * When Mr. Glover came in, he stooped over my father's body and jerked my father's clothes open and got the gun off of him. That was the pistol my daddy had. He straddled over my daddy and jerked the gun out of his clothes. It was located somewhere about here, and his shirt was buttoned over it. He got the gun in his hand. He got the gun in his left hand, and he slipped his gun and got the gun he got off of my daddy, and took his pistol in his right hand, and then grabbed the shotgun about half way of the barrel and started out of the

office, throwing the pistol around on me and my brother both. My father was dead at that time."

The incident was described by Mr. Fuller, a witness for the appellant, who testified as follows:

"Just about the time the shooting took place, I saw him (Gibbs) make a motion with his right hand. It appeared to me that motion he made was toward his pistol. This was an instant before the shots were fired."

On cross-examination Fuller testified that he could not say whether the deceased had a cigarette in his mouth at the time or not; that they had been smoking; that he did not see the man when he came to the door. He heard some one say, "Come here, old man," which exclamation was followed by the shots. The witness did not hear the deceased call for his glasses; that is, he was not positive upon the subject. Fuller said that the deceased had no gun in his hand, but had one sticking in his clothes. The witness could not say whether the words, "Come here, old man," were spoken while the appellant was standing in the door or not.

The witness Lee testified that as the appellant entered the house in which the homicide took place he took something from his pocket and changed it to his hand; that just as he entered the building he pulled something out of his pocket. The witness turned his back and a moment later heard three shots. Lee was an undertaker and examined the body of the deceased.

Eaves, the Justice of the Peace, testfied that he told appellant to arrest the deceased. From Eaves' testimony we quote:

"I saw Mr. Glover at the time he left the shop where the killing took place. Those two boys were scuffling with him, and as soon as he got loose he came across the street, and the best I can remember he said something to Mr. Hatton. He said something to me. I do not think he appeared to be excited; not so much. I do not know how much it would excite a man. I do not think he was excited too much. He said he was sorry he had to do it, but he just beat the old man to it; and when he showed me his finger where these boys were wrestling with him, you know, with the gun or something, that put a gash into his finger. There was not so awful much blood on that finger. It was skinned a little. After he left me, he went to Mr. Ferguson's. I noticed to see which way he went. I saw him turn the corner and I judge he went to Mr. Ferguson's, because I went down there a little later and he was there. I did not see Mr. Glover at the time he went in the printing office down there. At the time I met Mr. Glover a short time after the

homicide, he had, I believe, a shotgun and a pistol. I do not remember what kind of a pistol it was; a pretty good size pistol."

The witness Hughes testified that he talked to the appellant soon after the shooting and that appellant had a "long barreled single-barreled shotgun in his left hand, and he had a six shooter of foreign make in his right hand, and he had a six shooter in his scabbard." Appellant said that the foreign make six shooter was a German luger. The witness did not hear the shots fired. He noticed that the appellant's hand was bleeding. Mrs. Hughes gave testimony substantially the same as that of her husband.

The witness Smith, in behalf of the appellant, testified as follows:

"I talked to Glover at that time. That was shortly after the killing. I do not know just how long. I heard the shots fired. I do not know how long it was after the shots were fired that I talked to Mr. Glover. I had time to walk from the Eden Hotel down to opposite the Optimist office. That was a disance of, I guess, about seventy-five yards. Mr. Glover says, 'I had to kill that old man. I hated to do it. Here's his two guns. He had them drawed on me.' And I said, 'Go on up the street, Glover.' That is all I said. Then I went in the Optimist office. I declare I do not know who all were in there. * * * After the shooting took place, I went back to the Optimist. I met Mr. Glover, and he had those two guns in his hand, and he said he had to kill the old man; that they drew guns on him, and here are the guns. I do not remember his saying, 'Here are the two guns; they had them drawn on me a time or two.' I think he told me 'time or two' they had the guns on him. The impression that was left on me was that he was telling me that they had drawn both that pistol and that shotgun on him down there in the shop. I do not remember just what he said about it; but something like words to that effect."

The witness Coleman testified that after Eaves had directed the appellant to arrest Gibbs, the appellant said: "I will arrest him or kill him." He went in the direction of the court house, got his gun and handcuffs, put his handcuffs in his belt and his gun in his scabbard and then walked over to the Gibbs' building and pulled his gun some three or four steps before he got to the door. From the witness we quote:

"I do not think he had more than hit the door until he went to shooting. I heard three shots in succession. They were fired fast."

The several shots fired by the appellant took effect upon the deceased.

From the testimony of the witness, Shelton Marvin, the following appears: The witness saw the appellant park his car, get out and enter the Gibbs' building. When about eight or ten feet from the door, he pulled his gun out and walked to the door. Just as he entered inside of the building the shooting began. The witness ran to a place of cover. After the shooting he saw the appellant and the Gibbs boys come out of the building. One of the boys was in front of the appellant and the other was behind him. One of the boys hollered: *"Oh, you have shot my daddy; you have shot my daddy."* Appellant said: *"Your daddy is not hurt; you had better turn me loose and be back in there and see."* The boy who was in front turned loose and dashed into the house. One of the boys had the appellant by the wrist, and the other boy was behind him. Appellant had his pistol in his hand, swung around with it and jerked loose. When he jerked entirely loose, he held his gun up in front. The Gibbs boys was standing in front. The appellant went back in the house and immediately came out with the guns in his hands. He crossed over the street and went up the sidewalk. Like testimony came from the witness Pope and others.

The witness Eaves testified that before talking to him, the appellant met Hatton and said something to him. Eaves was a witness for the appellant. We have perceived nothing in the record which indicates that the reception of his testimony reciting the statement that was made to him by the appellant after the homicide was opposed by the State. The same condition applies to the witness Smith. In other words, the trial judge was not called upon to rule upon the admissibility of the testimony.

In bills of exception Nos. 9 and 10 appellant complains of the action of the court in rejecting the testimony of Mr. and Mrs. B. F. Hughes, proffered by the appellant, as a res gestae statement. The witnesses had seen the appellant enter the printing office of the deceased, had heard about the killing and thereafter saw the appellant pass their house and had a conversation with him in which he stated that he had to kill the deceased; that he hated to do so, but that the deceased was attempting to kill the appellant. The witnesses said that the appellant was excited at the time. In qualifying the bill the court used the following language:

"This bill is qualified in that the evidence shows defendant had talked to one or more persons after the homicide and be-

fore the conversation referred to was had and and it was not shown to how many as to whom defendant had talked to after the homicide and before said statements were made. Thus qualified this bill is allowed."

In Ruling Case Law, volume 10, p. 977, sec. 160, it is said:

"Incidents offered as res gestae may be separated from the act by a lapse of time more or less appreciable, provided they grow out of and are in a legal sense immediately connected with the litigated act. On the other hand, if declarations are not in their nature a part of the fact, they are not admissible in evidence, however closely related in point of time."

In the same text, page 978, sec. 161, it is said:

"A declaration, however, which is merely a narrative of a past occurrence, though made ever so soon after the occurrence, is not part of the res gestae and cannot be received in evidence. While the statements may be separated from the act by a lapse of time more or less appreciable, yet they must stand in immediate causal relation to the act—a relation not broken by the interposition of voluntary individual weariness seeking to manufacture evidence for itself. Declarations which are the result of an afterthought on the part of the declarant, made concerning a past event, are only hearsay and not competent evidence to prove the facts of such event."

The elements of res gestae and the principles governing them are well defined and found recorded in many books. A condensed summary of the judicial expressions upon the subject will be found in the case of Nami v. State, 97 Texas Crim. Rep. 522, see p. 534. All writers upon the subject declare that unless the statement is spontaneous, it cannot be received as res gestae. See Fulcher v. State, 28 Texas App., 465; Lewis v. State, 29 Texas App., 201; Stagner v. State, 9 Texas App., 440; Lindsey v. State, 35 Texas Crim. Rep., 164; Ingram v. State, 43 S. W., 518; Bradberry v. State, 22 Texas App., 273; Freeman v. State, 40 Texas Crim. Rep., 545; In the case of Bradberry v. State, supra, Presiding Judge White, approved and quoted from Wharton's Cr. Ev., 8th Ed. secs. 262, 263, the following:

"The test is, were the declarations the facts talking through the party or the party's talk about the facts? *Instinctiveness* is the requisite, and when this obtains the declarations are admissible."

In this State, the principle of res gestae has been liberalized, especially as to the space of time between the event and the relation of it, as appears from many decisions of this court,

notably Nami v. State, supra; Edmondson v. State, 114 Texas Crim. Rep., 290; Hill v. State, 48 S. W. (2d) 269; Fleming v. State, 101 Texas Crim. Rep. 19, 274 S. W., 616. However, the rule of res gestae and the governing principle thereof still remain a part of the statutory law of this State. See Nami v. State, supra; Greenleaf on Evidence, 13th ed. vol. 1, sec. 108.

In appraising the appellant's contention that there was error in excluding the part of the testimony of Hughes and wife, which is shown by bills of exception Nos. 9 and 10, the previous conduct of the appellant subsequent to the homicide demands consideration. That is to say, whether the excluded testimony was admissible under the rule of res gestae is to be determined by all of the circumstances before the trial court at the time his ruling was made. The language used by the trial judge in qualifying the bills mentioned, which language is quoted above, apparently implies that in the opinion of the judge the proffered testimony was not admissible for the reason that the burden resting upon the accused to show that the declarations were in fact res gestae was not met by the evidence portraying the conduct of the appellant subsequent to the homicide and before the proffered declarations were made. In other words, to affect the trial judge with error in making the ruling, it was incumbent upon the accused, as a predicate for the introduction of the declarations, to show that they grew out of his act in committing the homicide and were immediately connected with it. To accomplish this upon the facts shown in the record, it was essential that the previous declarations of the appellant and his conduct after the homicide be shown to come within the rule of res gestae as set forth in the various precedents to which reference is made above. Upon the facts in the record, it is manifest that after the shooting and before the declarations to Hughes and wife were made, the appellant had conversed with several other persons and had engaged in a struggle with the sons of the deceased, by whom it is claimed that they were endeavoring to disarm the appellant for fear of their own lives. In the conflict with them, the appellant presented his pistol, and without apparent danger to himself, re-entered the building, using his pistol to prevent an attack from the sons of the deceased while he possessed himself of the arms of the deceased, While in the conflict with the sons of the deceased, the appellant declared that their father was not killed. Before conversing with either Eaves or Smith the appellant was shown without controversy to have talked to Hatton, who testified and was a friendly witness. No effort was made to bring before this

court any denial of the fact that he did talk to Hatton or any explanation of the remarks that were made. Moreover, before the declarations to Hughes and wife were made, the appellant had made similar declarations to Eaves and Smith. Whether he had conversed with other persons than those mentioned above is not disclosed. Whether the trial court regarded the declarations made to Eaves and Smith as res gestae is also not disclosed. The testimony of Smith and Eaves showing the declarations of the appellant after the homicide was not opposed by objection upon behalf of the State. The trial court was therefore not called upon for an opinion touching its admissibility. In view of the facts which confronted the trial court at the time he declined to receive the proffered testimony of Hughes and wife and in the light of his statement in qualifying the bills of exception, this court apparently would step beyond the bounds of its authority if it should hold that the action of the trial judge, as portrayed by the entire record including the facts in evidence, was error which authorized a reversal of the judgment of conviction.

Bill of exception No. 1 complains of the refusal of the court to receive in evidence the answer to the following question:

"Defendant then asked said witness if it was not true that he, said witness, understood from the manner in which said hands were waved that he, deceased, was waving for some of the ones gathered before the bank to come on down there and follow the deceased, and that the deceased was mad and that they would settle the trouble down there."

The question called for an opinion, and the refusal to require an answer to it is deemed to have been proper.

It appears from bill of exception No. 2 that the witness Pope testified for the State that the justice of the peace commanded the appellant to arrest the deceased; that he went near the scene to the end that he might see the arrest. On' cross-examination the appellant sought to elicit from the witness the statement that the reason he wanted to see the arrest was that he was acquainted with the deceased and expected that he would resist an arrest. We fail to perceive the relevancy of the proof of what was in the mind of the witness at the time.

Bill No. 3 seems to be practically a duplication of Bill No. 2. It called for an opinion of the witness in that he expected that the appellant would have trouble in arresting the deceased and for that reason the witness went to the scene of the homicide.

Bills of Exception Nos. 4 and 5 deal with the complaint that the witness Lee was not permitted to testify that he ex-

pected the deceased to resist an arrest. The admissibility of the testimony is not perceived. Similar inquiry was addressed to the witness Sanders, as shown by Bill No. 6, and to the witness, Griffin, as shown by Bill No. 7. A like inquiry was made from the witness Eaves, as shown by Bill No. 8. In each of the foregoing instances the action of the court is deemed correct. None of the witnesses last mentioned were connected with the tragedy in any manner except as observers of the conduct of the parties. They were mere bystanders.

In Bill No. 11 it appears that the witness R. L. Smith was called for the appellant; that on cross-examination the witness was asked if it was not a fact that when the case was called for trial on a previous occasion the sister of the witness sat beside the appellant in the court room. An affirmative reply was not given. The bill shows no error.

In Bill No. 12 it appears that the appellant offered in evidence the following certificate:

"STATE OF TEXAS, COUNTY OF TYLER:

"I, Mrs. Bertha Prescott, County Clerk of said County and State, do hereby certify that J. D. Glover was, on the twenty-eighth day of July, 1931, appointed deputy by W. A. Ferguson, deputy of said county and state, and has qualified as the law directs, and that his official acts are entitled to full faith and credit.

"GIVEN under my hand and seal of office at Woodville, Texas, this twenty-eighth day of July, 1931.

"(Seal)

"Bertha Prescott, County Clerk, Tyler County, Texas."

Objection to the reception of the certificate in evidence was urged and sustained upon the ground that it was not sufficient to prove that the Commissioners' Court had sanctioned the appointment of the appellant. Upon the sustaining of the objection, the appellant offered in evidence the following part of the certificate:

"STATE OF TEXAS, COUNTY OF TYLER:

"I, Mrs. Bertha Prescott, County Clerk of said County and State, do hereby certify that J. D. Glover was, on the twenty-eighth day of July, appointed deputy by W. A. Ferguson. * * *

"GIVEN under my hand and seal of office at Woodville, Texas, this twenty-eighth day of July, 1931.

"(Seal)

"Bertha Prescott, County Clerk, Tyler County, Texas."

The vice in the ruling of the court or the injury to the accused is not perceived. The court instructed the jury, without

qualification, that the appellant was within his rights in going to the place of business of the deceased on the occasion in question and placing him under arrest. The right of the appellant to make an arrest in a legal manner is not a subject of controversy. From the testimony of B. C. Fuller, who was present at the time of the homicide and had a conversation with the deceased a few moments before he was killed, it appears that the witness informed the deceased that there might be an arrest, and deceased replied:

"Well, that is all right. I don't want that damn fellow Jones coming down here. * * * I don't want any of those fellows hanging around the jail coming down here after me."

It was shown that the appellant was a deputy sheriff. It appears from the bill that the appellant had been acting as deputy sheriff of Tyler County. On cross-examination of the witness Fuller, the State disclosed that Jones, to whom the deceased referred, did not stay in jail at Woodville, but was under indictment at the time the deceased was killed.

Bill No. 14 questions the soundness of the ruling of the court with reference to the argument of the district attorney. It appears that the witness Hatton testified in behalf of the appellant that he was in a position near the tragedy at the time it occurred and saw a pistol in the hands of the deceased at the time the fatal shots were fired by the appellant. On cross-examination by State's counsel, the locality of the witness at the time was made a subject of inquiry. Among other things, the witness denied that he was standing near a certain cedar tree in the yard of the house occupied by the mother of the district attorney. In his argument, the district attorney pointed out the locality of his mother's house on a certain photograph of the surroundings which was introduced in evidence. Appellant's counsel interposed an objection and contended that there was no evidence identifying the house of the district attorney's mother as portrayed in the photograph, and that consequently the reference thereto by the district attorney was improperly putting facts or evidence into the case. In the statement of facts there is exhibited the photograph in question, as well as a diagram of the surroundings, defining the streets and naming certain houses which had been referred to in the evidence. In qualifying the bill of exception complaining of the argument, the trial judge makes the following statement:

"There was other testimony in the record showing the location of the home of the mother of the district attorney; thus qualified, the bill is allowed."

Taking note of the record as we find it, and the bill as qualified by the trial court, the action of the judge in overruling the objection to the argument of the district attorney is not shown to have been erroneous.

The motion for new trial based upon the claim of the discovery of new evidence has been examined. Without stating the details, it is apparent from the recitals of the motion that the conditions stated do not meet the requirements of the law set forth in article 753, subd. 6, C. C. P. The averments of the motion, viewed in the light of the controverting affidavit, make evident the fact that the court was justified in concluding that the evidence was not newly discovered within the meaning of the law, and that no sufficient diligence was exerted to discover or obtain it. On the subject, see Vernon's Ann. Tex. C. C. P., 1925, vol. 3, art. 753, note 25, p. 13.

Our examination of the record and the consideration of the brief leads us to the conclusion that nothing occurred upon the trial which would justify this court in reversing the judgment of conviction. An affirmance is therefore ordered.

*Affirmed.*

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—In his motion for rehearing appellant urges that we have fallen into error in holding that the exclusion of the testimony of Mr. and Mrs. Hughes as to statements made to them by appellant was not such error as called for a reversal, and also that our holding regarding the complaint of argument of the district attorney brought forward in bill of exception No. 14 is erroneous.

As supporting the contention that the statements made by appellant to Mr. and Mrs. Hughes were res gestae, we are referred to the following cases. Bradberry v. State, 22 Texas Crim. Rep., 273, 2 S. W., 592; Fulcher v. State, 28 Texas Crim. Rep., 465, 13 S. W., 750; Lewis v. State, 29 Texas Crim. Rep., 201, 15 S. W., 642; Craig v. State, 30 Texas Crim. Rep., 619, 18 S. W., 297; Castillo v. State, 31 Texas Crim. Rep., 145, 19 S. W., 892; McGee v. State, 31 Texas Crim. Rep., 71, 19 S. W., 764; Garcia v. State, 70 Texas Crim. Rep., 485, 156 S. W., 939; Freeman v. State, 91 Texas Crim. Rep., 410, 239 S. W., 969; Davis v. State, 96 Texas Crim. Rep., 93, 255 S. W., 1112; Fleming v. State, 101 Texas Crim. Rep., 19, 274 S. W., 616; Hill v. State, 48 S. W. (2d) 269. All of the authorities have been examined. Wherever the *principle* of res gestae has been discussed in those cases they appear to emphasize the rule that there are no limits of time within which the res gestate can be arbitrarily confined,

and that the issue of *spontaniety* or *instinctiveness* is the controlling question. The lapse of time between the occurrence and and the statement resulting therefrom seems generally to have been extended where the party making the statement had been seriously wounded in the encounter, and was suffering pain as a result thereof when the statement was made. This court has long recognized the difficulty of applying the rule of spontaniety or instinctiveness. In Craig v. State, (supra), Judge Hurt said:

"Just when a fact or statement is or is not a part of the res gestae is one of the most difficult questions to solve known to the writer. The old rule was that, to be part of the res gestate, the fact or statement should be contemporaneous with the transaction, and this rule is approved by many courts of the first ability. On the other hand, the rule has been construed so as to admit acts and declarations occurring, not contemporaneously with the transaction, but which precede or follow it. 'And when they are to be admitted or rejected, if not coincident with the act or transaction in question, is a question of *judicial discretion* of embarrassing nicety. * * * ' "

The following is Judge Lattimore's language in Freeman v. State, (supra.)

"The spontaniety of the statement or matter offered in evidence under said res gestae rule is the test and this may be arrived at by consideration of the surrounding circumstances and the condition of the maker of such statements during the time which has elapsed since the occurrence or injury. Many authorities hold that when a condition of suffering exists from the infliction of the injury to the making of the statement in a given case it might extend far enough to preclude premeditation and in cases of this kind we have declined to be limted to any specific time."

In Nami v. State, 97 Texas Crim. Rep., 522, 263 S. W., 595, Judge Morrow, on rehearing, after quoting from certain text books, wrote:

"The above quotations from text-writers illustrate, and an examination of the reports would emphasize that in its application the rule of res gestae is most difficult. The rule is not so rigid or well defined as could demand absolute accuracy in its construction either by the trial or the reviewing courts. Many instances arise upon particular facts in which it is impossble to demonstrate whether the proffered evidence is or is not within the scope of the rule of res gestae. Taking note of these conditions, that there is some variety of opinion reflected by the decisions is not a subject of wonder and cannot be justly re-

garded as changing the rule. It cannot be denied that the decisions cannot all be harmonized either with the rule or with each other. * * * On appeal, however, its lack of rigidity and the difficulty of ascertaining its limits render it proper that the decision of the trial court touching its application should be given great weight."

We realize the great difficulty under which the trial court labors in determining the admissibility or otherwise of statements claimed to be res gestae whether such statments are offered by the State or the accused, and we are acutely aware of the difficulty which confronts this court in reviewing the action of the trial court in the regard mentioned. Under the facts presented in the present record, and which have been detailed at some length in our original opinion, our view remains as therein expressed that the action of the trial court should not be held to have been an abuse of judicial discretion in the premises.

Appellant's complaint of the argument of the district attorney registered by bill of exception No. 14 arose in the following way. It was appellant's contention that Mr. Gibbs, the deceased, had a pistol drawn on appellant at the time of the killing. This was disputed by witnesses for the State. A. R. Hatton testified that he was passing the printing office at the time of the shooting, being on the opposite side of the street therefrom, that he saw into the printing office and saw deceased with a pistol immediately before appellant commenced firing. Upon cross-examination Hatton declined to locate himself on the exact spot where he claimed to be at the time he saw the pistol. It appears from the record that a diagram showing the location of the printing office and other lots and buildings near there, and also a photograph of the location was introduced in evidence and used during the trial. By the judge's qualification to the bill it appears that evidence was in the record showing the location of the home of the mother of the district attorney. From the following excerpt taken from the cross-examination of Hatton by the district attorney it appears that either the diagram or photograph was being used in such cross examination. The witness, in reply to questions from the district attorney, testified:

"Some time after the accident I remember walking down there with you, like this is the corner of your mother's fence, and showing you where I was. 1 do not know whether I told you I was standing there on that spot of grass or not. You might have stepped it off from this corner down to where that

grass spot was. I showed you two or three places. That was as far as you went because you walked off and would not let me show you. I took you there at the beginning. I showed you that spot and you would not let me show you the rest. I did not tell you that was where I saw Mr. Gibbs. The first I saw Mr. Gibbs I was down near the telephone pole near the Weisenbecker store. That is the light or telephone pole there. * * * The place I showed you is where I was when Glover came across the street to me. * * * I did not tell you on that very afternoon on the day of the killing that I was standing just about the cedar tree where your mother's vacant lot adjoins on to her yard fence."

In the argument of the district attorney set out in the bill as objectionable it is apparent that he was also using at the time of the argument either the photograph or the diagram which had been introduced in evidence. The argument objected to was as follows:

"It really doesn't make any difference where Ace Hatton was. The question is, did he see the gun. It is not a question of where he was, but it is a question, did he see the gun. He could have been on top of the court house, and said he saw the gun. The question is, did he see it? The point that Ace was trying to make was that he realized that it looked bad for him to place himself right over here at the corner of my mother's yard, so he placed himself directly in front of that door. He decided that it would look awful bad for him to be standing at that time that he saw Gibbs with a gun in his hand over here. But didn't he tell me, he carried me to that place first? Finally, I screwed it out of him. Didn't you carry me to that little green spot right at the corner of my mother's yard? He finally admitted that was the first place he carried me to. I want you to notice this picture of those posts. I know that there is a street that comes right through here, and we were standing over here at this corner. We were standing over here at this corner, and that place there is directly across in front of that dwelling. That is where he finally, * * *."

At this point the argument was interrupted by objection, the ground being that the district attorney was stating facts with reference to the location of himself and Hatton at the time they had their conversation which had not been testified to by the district attorney or any other witness. A considerable colloquy between the district attorney and the court with reference to that matter is set out in the bill. Appraising the bill the best we are able in connection with the statement of facts,

the picture and diagram in evidence, we are unable to reach the conclusion that the bill shows that the district attorney was giving unsworn testimony in his argument. Nowhere in the bill is it shown that the particular place pointed out on the photograph by the district attorney in his argument was a place from which Hatton would have been unable to see things transpiring in the printing office. We may be confused, as is sometimes inevitable where photographs and diagrams are used, and attorneys and witnesses are familiar with localities which are strange to the court, but after having again given painstaking attention to said bill we are constrained to adhere to our original ruling that it fails to show reversible error.

The motion for rehearing is overruled.

*Overruled.*