## PHILLIP TRAMMELL V. THE STATE.

No. 22150.   Delivered October 21, 1942.
Rehearing Denied January 6, 1943.

The opinion states the case.

*Dave Watson,* of San Antonio, and *Purl & Purl,* of Corpus Christi, for appellant.

*Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

DAVIDSON, Judge.

Murder is the offense; the punishment, ninety-nine years in the State penitentiary.

That portion of the vast King Ranch situated in Nueces County is bounded on the south by the waters of the Laguna Madre, an inlet of the Gulf of Mexico. The other boundary lines, and especially that to the north, are marked by a substantial fence.

The submerged lands of the Laguna Madre are owned by the State of Texas, and, at the time hereinafter mentioned, and long prior thereto, were under lease to an oil company for development of oil and gas. To effectuate this development, it was necessary to travel over and across that portion of the King Ranch mentioned. The oil company had contracted with a construction company to do the necessary hauling of materials and supplies to the drilling sites. The construction company arranged with the King Ranch for the right-of-way and passage over their properties. One of the elements of this agreement was that a gate would be placed in the north fence, to be kept locked, and a gatekeeper at all times stationed thereat to permit entry and passage of only those entitled thereto.

For the use of such gatekeeper, a small three-room house was constructed near the gate. The deceased, J. M. (Scotty) Jetton, was employed by the construction company as such gate-keeper, and had been so employed for about eighteen months prior to his death; he occupied and lived alone in the gate-keeper's house.

The appellant was an employee of the King Ranch. His duties, primarily, were to trap predatory animals, ride fence, and, in general, to look after the interests of the ranch. He was also a state game warden, charged with enforcing the game laws. That portion of the ranch mentioned was a state game preserve. He lived alone in a camp located on the ranch and about two miles from the gate and gatehouse mentioned.

So far as this record is concerned, the appellant and deceased were good friends. Appellant was a regular and frequent visitor at the gatehouse, often playing dominoes and checkers with the deceased. This was the relationship existing between the parties on February 28th, 1941—the day of the homicide. The evidence shows that, about 10:00 A. M. that day, appellant arrived at the gatehouse, where he spent the day. Several work-men of the oil company were engaged that day in repairing a bridge near the gatehouse. All these, together with the wives of some of the workmen, had lunch at the gatehouse. Witnesses testified that, during this time, the appellant and deceased were friendly and congenial one with the other. The witnesses departed about 5:30 P. M., leaving appellant and deceased to-gether at the gatehouse. Soon thereafter, appellant and de-ceased, in appellant's car, drove to a small cafe about three-quarters of a mile away, where they drank several bottles of beer. They remained there about two hours, at the expiration of which they left and returned to the gatehouse.

Up to this point, the facts are not in dispute. As to what happened when appellant and deceased returned to the gate-house is the disputed issue.

The State's theory, based upon the physical facts and cir-cumstances, augmented by portions of appellant's confession, was that, after the parties arrived at the gatehouse, the de-ceased went into the house and appellant pretended to leave, but in fact laid in wait, and thereafter, while deceased was in the house, fired two shots, through a door thereof, from a 22

caliber rifle, which struck deceased; and that, after being so struck, the deceased came out of the house and fired upon appellant, with a shotgun, numerous shots from which took effect on appellant's body. About 8:00 A. M. the next day, employees of the oil company found deceased in the gatehouse, lying upon a cot, in a pool of blood, and in a dying condition. Among other things found was a .302 caliber rifle, lying in the yard, the but of which was broken off. Deceased was rushed to a hospital, but was practically dead upon arrival. An autopsy showed that death was caused solely from two bullet wounds inflicted with a .22 rifle which, the undisputed evidence showed, were fired from such rifle that not only belonged to appellant but was in his possession and in his automobile at the time of the shooting.

Appellant's version of the matter, as shown primarily by his testimony was that, when he and deceased returned from the cafe to the gatehouse, deceased got out of the car, when appellant suggested that he wanted to drive down to the shore of the Laguna Madre to investigate a report that a boat had been seen on or near the shore; that, before leaving, deceased invited him to return and to have supper with him, saying he would prepare same while appellant was away, which invitation appellant accepted; that appellant later returned to the gatehouse and stopped his car nearby, and in a place where he customarily parked it; that he got out of the car and, while standing nearby, answering a call of nature, deceased, while standing near the corner of the house, suddenly and without warning fired upon him with a shotgun, the charge therefrom striking him in the chest, that the impact therefrom knocked him down; that he arose and went to his car, turned on a spotlight which was on the car, and with which he was able to see the deceased, standing in the back yard, with a shotgun in his hand; that he turned the spotlight off and shouted that he had been shot; that he then reached into his car and took therefrom a .303 lever action rifle, and, as he did so, deceased again fired the shotgun, the charge from which struck the stock of the rifle, causing it to discharge; that he reloaded the .303 rifle and fired in the direction from which the shots had been fired at him; that he immediately got into his car and drove in search of medical treatment for himself; that he drove to the home of the witness Pearse, about four miles away, when he secured Pearse to drive him to a Corpus Christi hospital for treatment of his injuries.

There were, in the appellant's car, at the time of the shooting, the .22 rifle, a pistol, and the .303 rifle. Appellant vigorously asserted that he never at any time either fired, or took from his car, the .22 rifle, and said that the only shots fired or attempted to be fired by him were from the .303 rifle.

Pearse testified, in behalf of the State, that, about 9:30 P. M. on the date of the alleged homicide, appellant came to his house and asked him to take him to a hospital; that appellant told him he had been shot, saying, in this connection, "He got me but I got him."; that he drove appellant, in appellant's car, to a hospital in Corpus Christi; that appellant did not, at any time, tell him how the shooting occurred, when or where it happened, or who had shot him, "but told me just to keep it to myself"; that they arrived at the hospital within about fifteen minutes, whereupon appellant told the nurse that "it is accidental, an accident," and told her the name of the doctor he wished to treat him; and that, during all of this time, appellant was bleeding, suffering, and in pain. After delivering appellant to the hospital, Pearse returned to his home, in appellant's car, in which were the guns, that is, the .22 rifle, and the pistol. He said he then went back to bed without reporting the incident to anyone.

The following afternoon, peace officers, after talking with Pearse, went to his (Pearse's) home and there found the car, and, in Pearse's home, the .22 rifle, which Mrs. Pearse delivered to them. Mrs. Pearse did not testify as a witness in the case.

Dr. Koepsel, the physician who attended appellant at the hospital, testified as a witness for the appellant, upon direct examination, described appellant's injury as being a shotgun wound on the right side of the chest, inflicted with bird shot, none of which, however, had penetrated the chest cavity or lung. He said that, at that time, appellant was in a state of shock, had lost considerable blood, and was suffering much pain.

This constitutes a sufficient statement of the facts for a consideration of the questions presented for review.

It is insisted that the facts are insufficient to support the conviction. With this contention we are not in accord. Appellant having admitted his presence at the time and place of the shooting, together with the ownership and possession, at the

time, of the gun with which the deceased was killed, and that he did fire a gun on that occasion, taken in connection with the physical facts, we conclude that this was sufficient to authorize the jury's conclusion of guilt. While it is true that, by his own admission, Pearse was in possession of the rifle from the time he left the hospital until the next day, and, during that time, was also in possession of appellant's automobile, with both time and opportunity available to him to have committed the offense himself, before the body of deceased was found, yet the absence of any suggestion in the testimony that he did so, or that he had a motive for so doing, supported by his positive declaration that, upon arriving home after his return from the hospital, he went to bed and did not know, until the next day, who was killed, is sufficient to disprove any hypothesis of the guilt of another that might be suggested by reason of his possession of the automobile and rifle.

The facts are sufficient to support the jury's conclusion of guilt.

Appellant offered to prove, by Dr. Koepsel, that, at the time of, and as a part of, the conversation he had with the appellant, he (appellant) detailed to him what happened at the scene of the shooting; that appellant told him, among other things:

"I don't know why he did that to me; I don't know why he would do that to me"; and said, "I had to shoot him," or "I had to shoot."

The State's objection to this testimony as being a self-serving declaration was sustained. That it was a self-serving declaration is not open to serious question. Generally speaking, self-serving declarations of one accused of crime are not admissible. They become so, however, when made under certain circumstances, that is, when they constitute a part of the res gestae, or when the State has proved only a part of a conversation or statement in which they were made, or when they contradict or explain an act or declaration first offered in evidence by the State. 18 Tex. Jur. 152.

By proper bills of exception, appellant insists that the statement so offered comes within the exceptions mentioned and that: (a) the testimony was admissible as a part of the res

*gestae;* and (b) the State's cross-examination of the doctor was such as to authorize the introduction of the testimony in reply to matters first developed by the cross-examination of the witness.

We discuss the contentions in the order named.

As a predicate to show that the statement was a part of the res gestae, the bills of exception certify that the length of time transpiring from the time of the shooting until the conversation occurred was about thirty minutes, it having taken that much time for the appellant to drive to the home of Pearse, and from there to the hospital; that, during all of this time, the appellant was suffering pain and anguish, and, when first seen by the doctor, was in a state of shock, and was excited. In connection with these facts, the record reveals that, while Pearse was with appellant, they talked about the shooting; that, when the doctor arrived, he asked appellant what happened to him, to which appellant replied:·

"You are a doctor, aren't you?"; to which the doctor answered, "Yes." The appellant then said: "Well, you can take care of my condition, can't you?"; to which the doctor replied: "Yes, I think so," appellant then saying: "Well you do that." All of this conversation with the doctor transpired prior to the making of the statement which was desired to be proven.

No fast or hard rule has been laid down by which it may be known that a declaration by one accused of crime is a part of the res gestae. Each case must depend upon its own peculiar facts. There are, however, certain basic principles which must be regarded as established and controlling. For a statement to be a part of the res gestae, the declaration must deal substantially with, and must grow out of, the main fact so as to be spontaneous and not, in any event, a narration of a past event or occurrence. Above everything else, there must exist that spontaneity which takes the statement out of the realm of narration or premeditation. The authorities supporting this rule are numerous. We cite: Butler v. State, 131 Tex. Cr. R. 543, 100 S. W. (2d) 707; Hamilton v. State, 138 Tex. Cr. R. 205, 135 S. W. (2d) 476; Glover v. State, 126 Tex. Cr. R. 56, 70 S. W. (2d) 155; Banks v. State, 95 S. W. (2d) 421, 130 Tex. Cr. R. 505; Bradford v. State, 122 Tex. Cr. R. 191, 54 S. W. (2d) 516; 18 Tex. Jur. 297; Branch's P. C., Sec. 83.

The proffered statement was lacking in the necessary spontaneity. This is demonstrated by the studied conversation with the doctor prior to the making of the statement, to say nothing of the conversation, had with Pearse, relative the shooting, prior to the arrival at the hospital. The proffered statement was not a part of the res gestae, and, therefore, was not admissible as such. Was the statement admissible by reason of the State's cross-examination of the witness? This presents the troublesome question. To properly appraise same, we call attention to certain facts which stand out in this record. These are: There were no eye-witnesses to the killing. The deceased came to his death, solely and alone, from being shot with the .22 rifle. He was not shot with the .303 rifle. Appellant denied having fired the .22 rifle, or that he took it out of his car at the time of the shooting or at any time before or after the shooting. He admitted having fired the .303 rifle. He vigorously asserted that what he did was, under the circumstances, in his own necessary self-defense, after he had been shot by the deceased.

Upon direct examination of Dr. Koepsel, the appellant was permitted to prove, by the witness:

"The defendant told me how he received that wound. He did not name the man who shot him. He did not tell me who he was in any manner. He told me he had done some shooting himself. You ask me if he told me whether or not he had succeeded in shooting any one out there; in answer I will say he said he shot. He said he didn't know if he had hit any one when he shot." The foregoing comprises the whole of the doctor's direct testimony as to what appellant told him at the time.

Upon cross-examination, the State proved, by the doctor, that, during that conversation, the appellant told him among other things:

"You ask me if the defendant Trammell did not say to me that night substantially, that he had shot another man with a .22 calibre high power cartridge; in answer I will say that he said he reached in his car and got a gun, and he had a .22 rifle in the car and a pistol, and he started shooting. — — — — — — — — — — — — — — — — —. — he said he had a .22 and a pistol

in the car and he got the rifle and started shooting at the other man."

Upon re-cross-examination, the State further proved, by the witness that, at the court of inquiry, he testified that appellant told him he had shot the other man with a .22 calibre high power cartridge or cartridges, and that appellant "told me that he had a pistol and a .22 rifle in his car, and he said he reached in and got the rifle."

As far as we have been able to ascertain from this record, the cross-examinations above pointed out constitute the only testimony in this case, that, directly, places, in the hands of the appellant, at the time of the shooting, the .22 rifle with which the deceased was killed. Such testimony was not only material to the State's case, but was contradictory of the appellant's testimony that he did not fire the .22 rifle. By such cross-examination, the State was placing before the jury evidence which it had been unable to produce, directly, from any other source, i. e., that the appellant did in fact fire the .22 rifle. Under the circumstances detailed, was the appellant entitled also to have the doctor testify, as a part of the same conversation, that he (appellant) told him, among other things: "I had to shoot him," or, "I had to shoot"?

It must be remembered that by no other testimony, outside of this proffered statement to the doctor, was appellant supported in his theory of self-defense.

Art. 728, C. C. P., reads as follows:

"When part of an act, declaration or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as, when a letter is read, all letters on the same subject between the same parties may be given. When a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also be given in evidence."

When a party, on cross-examination of a witness, elicits from the witness new matters not inquired about in the direct examination or examination in chief, he makes the witness his own for that purpose (Bassham v. State, 38 Tex. 622). Upon

re-direct examination, a witness may be examined as to the matters first inquired about or developed upon cross-examination, even though the facts elicited would have been inadmissible as original or direct testimony. 44 Tex. Cr. Jur. 1187; Chappel v. State, 126 S. W. (2d) 984, 136 Tex. Cr. R. 528; Porter v. State, 128 S. W. (2d) 395, 137 Tex. Cr. R. 100; Johnson v. State, 32 S. W. (2d) 840, 116 Tex. Cr. R. 453; Avirett v. State, 128 Tex. Cr. R. 647, 84 S. W. (2d) 482. In the Johnson case, supra, a murder case, the State, to show guilt of the accused, relied upon, and introduced in evidence, a statement that the accused had made to an officer, to the effect that he had stabbed the deceased. The accused offered to prove, by the officer, that, at the same time, he detailed how the incident occurred, and, as a part of which, he showed that the killing was in self-defense. The trial court sustained the State's objection to that part of the conversation showing that the killing was in self-defense. In holding such action error, this court, speaking through Judge Martin, said:

"The State having introduced part of this conversation, the appellant was entitled to the remainder of it relating to the same subject, as has been held in authorities so numerous that their collation here would occupy undue space. The question is not debatable." Numerous authorities are cited supporting the rule, which we do not here re-copy.

The rule stated is applicable and controlling here. Under the facts of this case, the rejected testimony was a part of, and was explanatory of, the incriminative facts which the State had developed upon its cross-examination of the witness.

If the appellant, in the conversation with the doctor, admitted to him that he had in fact fired the .22 rifle, as the doctor's testimony tended strongly to establish, and if this fact were first inquired about and developed, by the State, upon cross-examination of the doctor, we cannot escape the conclusion but that the appellant was entitled to have the jury also told, by the doctor, that, at that time, and as a part of that conversation, he told him that he "had to shoot him," or that he "had to shoot."

From what has been said, it follows that the action of the trial court in rejecting the proffered testimony was error, which requires a reversal of the case.

The conclusion is reached that, as here presented, the testimony complained of in Bills of Exception Nos. 3, 4, and 5, to the effect that, about eighteen months prior to the homicide, appellant shot a lock from off the gate, was too remote, and that its relation to the homicide was of such a speculative nature as to render it inadmissible. We do not hold that the admission thereof in the instant case, standing alone, would warrant a reversal of the case. What we have here said touching the matter is for the trial court's benefit, in the event of another trial.

The other matters presented in the record will hardly arise upon another trial, and, therefore, are not discussed.

For the error pointed out, the judgment of the trial court is reversed and the cause remanded.

BEAUCHAMP, Judge, did not participate in the disposition made of this case.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON MOTION FOR REHEARING.

GRAVES, Judge.

The State's Attorney has filed a motion for a rehearing herein, alleging that we were in error in our holding that the provisions of Art. 728, C. C. P. were violated when the trial court failed to allow Dr. Koepsel to detail the latter portion of a conversation with appellant wherein he said: "I don't know why he did that to me; I don't know why he would do that to me; I had to shoot him" or "I had to shoot."

It is said of Art. 728, C. C. P. that: "This article expands the common law rule. At common law, when a confession or admission is introduced in evidence against a party, such party is entitled to prove the whole of what he said on the subject at the time of making such confession or admission. But this article does not restrict the expanatory act, declaration, conversation or writing to the time when the act, declaration, conversation, or writing sought to be explained occurred, but extends the rule so as to render such acts or statements admis-

sible, if necessary to a full understanding of, or to explain the acts or statements introduced in evidence by the adverse party, although the same may have transpired at a time so remote as to not be admissible as res gestae." Greene v. State, 17 Tex. App. 395; Rainey v. State, 20 Tex. App. 455; Harrison v. State, 20 Tex. App. 387, 54 Am. Rep. 529; Smith v. State, 46 Tex. Cr. R. 267, 81 S. W. 936, 108 Am. St. Rep. 991." See Note 2, art. 728, Vol. 2, Vernon's Texas C. C. P.; Autry v. State, 157 S. W. (2d) 924; Henry v. State, 106 Tex. Cr. R. 198, 291 S. W. 542.

We remain of the opinion that all the conversation had with Dr. Koepsel relative to the transaction inquired about should have been admitted by the court.

The motion will be overruled.