**Jack RUBENSTEIN, alias Jack Ruby, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 37900.**

Court of Criminal Appeals of Texas.

Oct. 5, 1966.

Rehearing Denied Nov. 16, 1966.

See also, Tex.Cr.App., 403 S.W.2d 129.

Phil Burleson, Dallas, Sam Houston Clinton, Jr., Austin, William M. Kunstler, New York City, Sol Dann, Detroit, Mich., and Elmer Gertz, Chicago, Ill., for appellant.

Joe H. Tonahill, Jasper, Emmett Colvin, Jr., Dallas, and Melvin M. Belli, Sr., San Francisco, Cal., amici curiæ.

Henry Wade, Dist. Atty., William F. Alexander, Frank W. Watts, Wilson Johnston and James M. Williamson, Asst. Dist. Attys., Dallas, and Leon B. Douglas, State's Atty., Austin, for the State.

OPINION

MORRISON, Presiding Judge.

The offense is murder; the punishment, death.

Shortly after noon on November 22, 1963, the President of the United States was assassinated within the courthouse area in the city of Dallas. A short while thereafter Lee Harvey Oswald was apprehended, but only after Patrolman Tippitt was killed in an effort to question him. Oswald was placed in the Dallas city jail. Two days later on November 24, in the basement of the city jail as Oswald was being transferred to the county jail, he was shot by appellant at close range, from which wound he died. Countless thousands witnessed this shooting on television. Four days later this appellant was indicted for Oswald's murder. His sole defense was that of insanity in that he was suffering from psychomotor epilepsy.

On February 10, 1964, a change of venue hearing began in Criminal District Court No. 3 of Dallas County upon the motion of appellant to transfer the case to some county other than Dallas. The Court did not grant the change of venue; the selection of the jury began on February 17, was completed on March 3, and a verdict of guilty with punishment set at death was returned on March 14.

The voluminous record in this appeal finally reached this Court, and the case was set for submission on March 10, 1965.

Prior to submission a serious question arose as to which of many lawyers should be recognized by this Court as appellant's counsel on appeal. In view of this, we entered an order directing the trial court to hold a hearing to determine whether or not appellant had become insane since his trial and thereby rendered incapable of rationally selecting his counsel. Such hearing was held, and the record reached this Court containing a finding that appellant was presently sane, and we promptly set the case down for submission.

During the trial, over the strenuous objection of appellant that anything appellant may have said while in police custody constituted an oral confession in violation of the statutes of this State and was not admissible as res gestae, Sgt. Dean of the Dallas police testified as to a conversation which he had with appellant on the fifth floor of the Dallas city jail where he had been incarcerated, undressed and interrogated by other officers before Dean and Secret Service Agent Sorrells arrived at his cell. Prior to answering any of Sorrells' questions, appellant asked if his answers would be made available to "magazines or publications" and after being assured that he was being questioned only for police purposes, appellant replied, "I'll be glad to answer your questions."

The time element which elapsed between appellant's arrest and the conversation in question varies between 10 and 40 minutes depending upon whether Dean's testimony at the trial or his written report made two days after the occurrence is accepted. Be this as it may, appellant was in a jail cell and had been interrogated by other officers prior to this conversation. Under none of the authorities cited in Notes 1–3 of Moore v. State, Tex.Cr.App., 380 S.W.2d 626, could this statement be held to have been spontaneously made. See also Holman v. State, 92 Tex.Cr.R. 364, 243 S.W. 1093; McBride v. State, 115 Tex.Cr.R. 378, 27 S.W.2d 1100; Bradford v. State, 122 Tex. Cr.R. 191, 54 S.W.2d 516; Hamilton v. State, 138 Tex.Cr.R. 205, 135 S.W.2d 476; Trammell v. State, 145 Tex.Cr.R. 224, 167 S.W.2d 171; Oldham v. State, 167 Tex.Cr. R. 644, 322 S.W.2d 616; and Furrh v. State, 168 Tex.Cr.R. 299, 325 S.W.2d 699, cited by appellant's counsel and counsel acting as friends of the Court. The test in this State is spontaneity and these facts do not fit the test. One who is cautious enough to inquire whether his answers to the questions to be propounded to him are to be released to news media is not speaking spontaneously.

Sorrells questioned appellant about how he had been able to penetrate the police cordon protecting the transfer of Oswald. At the conclusion of this questioning and as they were preparing to leave, according to Dean's testimony he asked appellant a question and appellant told Dean that he had seen Oswald in a police line-up two nights before and that when he saw the sarcastic sneer on Oswald's face he had decided that if he got a chance to do so, he would kill him. Obviously this statement constituted an oral confession of premeditation made while in police custody and therefore was not admissible. The admission of this testimony was clearly injurious and calls for a reversal of this conviction.

What we have heretofore said makes it unnecessary to discuss in detail the error of the court in failing to grant appellant's motion for change of venue. Both Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, and Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, were decided after appellant's trial, but each case related to a state court trial held prior to appellant's trial and determines the law applicable to this case, and both are hereby controlling. It is abundantly clear from a careful study of both opinions of the Supreme Court of the United States and the record of this case that the trial court reversibly erred in refusing appellant's motion for change of venue. Not only are we bound legally by the holdings of the Supreme Court, but as practical public servants it becomes our duty to avoid the costs which are taxed against the State of Texas when one of our decisions fails to follow the rules announced by the Supreme Court. See also Pamplin v. Mason (CCA 5th July 27, 1966), 364 F.2d 1, affirming Mason v. Pamplin, W.D.Tex.1964, 232 F. Supp. 539.

Judge Joe B. Brown, who tried this case, has recused himself from any further connection with the case and, we have concluded, properly so.

For the errors pointed out, the judgment is reversed, and the cause is remanded with directions that the venue be changed to some county other than Dallas. It is so ordered.

## CONCURRING OPINION

McDONALD, Judge.

I agree with the result reached by Presiding Judge Morrison in his opinion reversing this case. However, I desire to elaborate more fully on the error of the trial court in refusing to grant the motion for change of venue. I shall recite in detail some pertinent facts in the case pertaining to the venue question.

The trial of this cause started February 10, 1964, with a change of venue proceed-

ing. It culminated the following March 14, 1964, with the death penalty verdict. The hearing on venue and subsequent proceedings took place in the same building to which Lee Harvey Oswald was being moved at the time he was shot. This same Ruby trial building is situated approximately one hundred yards from where Lee Harvey Oswald assassinated President Kennedy two days previously.

It is apparent from the record that President Kennedy's assassination occurred at a site on a Dallas Street so close to the Ruby trial courthouse that it could be seen daily by the jurors. At the time of this trial this location was being visited by the public who were placing wreaths at the historic spot out of respect to President Kennedy. Traffic was even then becoming jammed in the area by spectators.

Dallas was being blamed directly and indirectly for President Kennedy's assassination and for allowing the shooting of Oswald by Ruby. The feeling and thought had been generated that Dallas County's deprivation of prosecuting Oswald could find atonement in the prosecution of Ruby. The writer feels it fair to assume that the citizenry of Dallas consciously and subconsciously felt Dallas was on trial and the Dallas image was uppermost in their minds to such an extent that Ruby could not be tried there fairly while the state, nation and world judged Dallas for the tragic November events.

The press had a field day with stories stating directly, indirectly, by hints and innuendoes that a Communist conspiracy existed between Oswald and Ruby. Ruby was referred to as a "tough guy," a "Chicago mobster," a strip-joint owner. Anti-Semitism against Ruby was sparked by pretrial publicity that Ruby's name had been changed from Rubenstein to Ruby.

The strong local prejudice against Ruby was reflected in the refusal of the County-operated Parkland Hospital to permit Ruby to undergo neurological testing for the purpose of determining his organic brain condition for trial purposes.

The trial judge retained the services of a prominent public relations counselor to handle the courtroom seating, the press, the trial publicity, and public relations in advance of the venue hearing and for the entire trial. Some 300 members of the news media occupied most of the seats in the courtroom.

The fact of the shooting of Oswald had been seen on television many, many times on that fateful day, November 24, 1963, in the Dallas County area, by countless thousands of citizens. This alone precluded Ruby from receiving a fair and impartial trial by a Dallas County jury. A fair and impartial trial is the rightful boast of western civilization.

Against such a background of unusual and extraordinary invasions of the expected neutral mental processes of a citizenry from which a jury is to be chosen, the Dallas County climate was one of such strong feeling that it was not humanly possible to give Ruby a fair and impartial trial which is the hallmark of American due process of law.

The late, eminent Mr. Justice Frankfurter stated in his concurrence in Irving v. Dowd, 366 U.S. 717, 729, 730, 81 S.Ct. 1639, 1646, 6 L.Ed.2d 751:

> "* * * rudimentary conditions for determining guilt are inevitably wanting if the jury which is to sit in judgment on a fellow human being comes to its task with its mind ineradicably poisoned against him. How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court when, before they entered the jury box, their minds were saturated by press and radio for months preceding by matter designed to establish the guilt of the accused? A conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception."

Ten of Jack Ruby's trial jurors witnessed the shooting of Oswald on television. They were challenged for cause under Article 616, Vernon's Ann.C.C.P., which prohibits a witness serving as a juror. Such challenges for cause were summarily dismissed and disposed of by the trial judge with dispatch.

Other than the testimony on voir dire of jurors Shields and Malone, we shall pretermit detailing the voir dire examination of the jurors.

Juror Shields witnessed the shooting on television. She was objected to as being a witness to the offense as well as the others who saw it on television. The trial court refused to grant Ruby an additional peremptory challenge so that he could remove her as a juror. Ruby moved the Court to swear Juror Shields as a witness and the Court refused.

Juror Malone was a witness to the shooting on television and was objected to as being disqualified under Article 616, V.A.C.C.P. She knew that from what she had witnessed on television that Oswald was shot in the Dallas Police Station November 24th and subsequently died as a result of being shot with a pistol. *It was the most extraordinary thing she had ever witnessed.*

Nothing could remove her fixed knowledge of Oswald's being shot in the Dallas Police Station. The only thing she did not know about the case as a fact was who fired the gun. All other issues pertaining to the shooting of Oswald were firmly and permanently fixed in her mind. She subsequently learned from television that it was Ruby who shot Oswald.

The trial judge seated her as a juror over the protest of Ruby's counsel who insisted upon being given additional peremptory challenges in order that she might be challenged as an objectionable juror.

The crux of Juror Malone's disqualification as a juror is explicitly reflected in the following excerpt during her voir dire examination:

"Q. But you do say that from what you have seen and read, it is firmly fixed in your mind that this extraordinary shooting you witnessed was to the effect that Oswald was shot that Sunday morning, in the police station, and the only thing you don't have fixed in your mind is who did it. Is that right?

"A. That's right.

"MR. TONAHILL: May it please the Court, we exercise and invoke Article 616, Code of Criminal Procedure, and ask that the lady be excused for cause.

"THE COURT: Overrule your challenge.

"MR. TONAHILL: Exception."

Article 616, V.A.C.C.P. (6) commands and requires that witnesses to the charged offense cannot serve as jurors. The Supreme Court of the United States in Rideau v. State of Louisiana, 373 U.S. 723, 83 S. Ct. 1417, 10 L.Ed.2d 663, has held that such objectionable jurors as Shields and Malone were, in effect, witnesses to the offense. Further, that Court has held that even non-witnesses who have been saturated with prejudicial news releases and rumors, and who hold a state of mind as objectionable jurors Shields and Malone possessed were not qualified as fair and impartial jurors, Irvin v. Dowd, supra.

There can be no difference to the competency of a witness who has heard via telephone or radio, or saw a matter through a mirror or field glasses, and a witness who has viewed a matter on television. A contrary holding would undermine the sound principles underlying the utilization of a scientific amplification and reproduction of sensory events, and thus unduly hamper the work and function of the triers of fact. In short, the television viewer meets the

established criterion of personal observation required for a witness' competency. Estes v. State of Texas, supra. The State operated from this inevitable and certain principle when it introduced the television film of the shooting of Oswald before the jury as direct evidence of the shooting.

The trial court could not, consistent with the due process, assume that the objectionable jurors Shields and Malone were endowed with a sense of detachment, so clear in introspective perception of their own mental processes that they could possibly exclude even the *unconscious* influence of their preconceptions as to all the established facts except identity of Ruby. Their mental processes were engendered by a pervasive pretrial publicity which denied Ruby his guarantee of a fair trial by a panel of "impartial, indifferent" jurors; because, "[t]he failure to accord an accused a fair hearing violates even the minimal standards of due process." Irvin v. Dowd, supra, 366 U.S. at 722, 81 S.Ct. at 1642.

Against this background of crystalized opinions of the existence of the material issues with which the State was burdened to prove, Jack Ruby was forced to trial under the most adverse, unusual and extraordinary circumstances that this member of this Court has yet had occasion to consider.

It is stated in Estes v. State of Texas, supra:

> "A defendant on trial for a specific crime is entitled to his day in court, not in a stadium, or a city or nationwide arena. The heightened public clamor resulting from radio and television will inevitably result in prejudice. Trial by television is, therefore, foreign to our system."

It was established below on the hearing for change of venue, the jury voir dire, and the *quick* verdict that the firmly established legal principles of law in this state and nation cried out for a change of venue of this case, which would guarantee Ruby the fair and unprejudiced trial which he failed to receive. At the same time, such transfer would cast no reflection, indictment against, or a challenge to the honesty, integrity or inability of the Dallas citizenry to give such. Rogers v. State, 155 Tex.Cr.R. 423, 236 S.W.2d 141.

In the brief of the Friends of the Court, and during his oral argument at the Bar before this Court when he appeared under the designation of this Court as "Friend of the Court," trial counsel Tonahill ably urged and pointed out this basic principle of our jurisprudence which this Court has consistently followed.

The principles compelling a change of venue have been enunciated by this Court many times. Streight v. State, 62 Tex.Cr.R. 453, 138 S.W. 742; Coffman v. State, 62 Tex.Cr.R. 88, 136 S.W. 779; Williams v. State, 162 Tex.Cr.R. 202, 283 S.W.2d 239; also see: Cortez v. State, 44 Tex.Cr.R. 169, 69 S.W. 536, 537, and Manley v. State, 62 Tex.Cr.R. 392, 137 S.W. 1137.

The general rule that a change of venue lies within the sound discretion of the trial judge has to give way when an unfair jury is forced on one charged with crime.

It is to be noted that all twelve of Ruby's jury entertained some conceptions of his guilt, one way or the other. The people of Dallas County had been exposed repeatedly and in great depth to the actual shooting of Oswald on television re-runs. In a similar case, Rideau v. State of Louisiana, supra, the Supreme Court of the United States did not bother to look to the transcript of the voir dire in reaching its determination as to prejudice:

> "* * * [W]e do not hesitate to hold, without pausing to examine a particularized transcript of the voir dire examination of the members of the jury, the due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview.' * * *" 373 U.S. 723, 727, 83 S.Ct. 1417, 1419.

This Court has been furnished with many outstanding briefs and many oral arguments were made by a battery of very able lawyers on both sides. This writer has been especially impressed with the conduct of Honorable Joe Tonahill. Through much stress and strain, misunderstanding among client and appellant's relatives, he has exemplified the highest standards of the legal profession, remained true to his duty, and done an outstanding job in briefing and presenting this case before this Court.

I concur in the reversal of this cause.

## CONCURRING OPINION

WOODLEY, Judge.

The writer concurs in the reversal of the conviction because of the court's failure to change the venue and the admission in evidence of the testimony of the Witness Dean as to an oral statement of the appellant made while he was in jail, which statement, if made, was in the nature of a confession and inadmissible under Art. 727, Vernon's Ann.C.C.P.

Though appellant's counsel did not seek a continuance and there is sufficient evidence aside from Dean's testimony to sustain the jury's verdict, the errors mentioned were such as to deprive Jack Ruby of a fair trial on the issue of the punishment to be assessed by the jury.

For a better understanding of the delay in the submission of the appeal herein, and of the claim that Jack Ruby's right to be represented by counsel of his choice was violated by the sanity hearing, the following orders, quotations and facts shown therein and elsewhere in the record are deemed pertinent.

The record on appeal was filed in this Court on January 14, 1965, and on February 24, 1965, the following order was entered:

"This appeal from a murder conviction, with punishment assessed at death, has been heretofore set for submission on March 10, 1965, briefs to be filed by March 3, 1965.

"Postponement is requested on behalf of appellant to allow new counsel time to prepare their briefs and argument.

"Though the appellant occupies before this Court the position of an indigent, controversy has arisen as to which of several lawyers—none of them court appointed and some non-residents of Texas—should be recognized by this Court as his counsel on appeal entitled to use the time allowed for oral argument in his behalf.

"The issue of insanity at the time of the killing and present insanity were raised at the trial and the jury found that appellant was sane.

"A principal, if not the controlling fact determinative of the question as to which attorneys are to be recognized by this Court and be permitted to use the time allowed for oral argument upon submission of the appeal, is whether or not appellant has become insane since his trial. This is true because we have before us an affidavit of appellant asking that one of his trial counsel be dismissed and not permitted to argue his case before this Court and further requesting that an out-of-state firm of lawyers be permitted to participate and asking for a delay in order for such firm to prepare.

"Subsequent to the trial, affidavits were presented to the trial court to the effect that appellant is presently insane, together with a motion to postpone the hearing on question of his present sanity.

"Art. 932b V.A.C.C.P., Sections 4 and 5, provide:

" 'Sec. 4. If the question of the sanity of a person under death sentence is raised and sufficient proof is shown to satisfy the judge of the convicting court or the judge of the district court of the county in which the person is confined that reasonable doubt exists

as to his sanity, the judge shall impanel a jury to determine whether the person is sane or insane. If the jury finds the person is insane, the court shall enter an order committing him to a State mental hospital to be confined therein as a person charged with a criminal offense until he becomes sane. If the jury finds the person is sane, the court shall remand him to the proper authority for disposition according to law.'

"'Sec. 5. When a defendant is found to be insane and committed to a State mental hospital under this Chapter, all further proceedings in the case against him shall be suspended until he becomes sane, except that upon motion of a defendant's counsel an appeal from a conviction may be prosecuted.'

"We have concluded that the submission of this appeal and decision on the question as to who will be recognized by this Court as appellant's counsel on appeal should be postponed to allow time for the trial judge to judicially determine in the manner authorized by Art. 932b V.A.C.C.P. the question of appellant's present sanity or insanity."

In the Per Curiam opinion of this Court of May 18, 1966, in Ex parte Jack Ruby, No. 39,613 (motion for certiorari pending), we said:

"Jack Ruby is in the custody of the Sheriff of Dallas County, as the law requires him to be for this Court to have jurisdiction of his appeal from his conviction, with punishment assessed at death, which is pending before this Court in our Cause No. 37,900, styled Jack Rubenstein, Alias Jack Ruby vs. The State of Texas.

"This Court is and has been since February 24, 1965, ready, able and willing to hear, consider and decide the questions raised in said appeal in Cause No. 37,900, including the question of the claim of denial of due process and the validity of the judgment of conviction.

"Controversy continues as to whether Hon. Joe Tonahill, one of appellant's trial counsel, should be permitted to represent him on appeal from his conviction for murder.

"Judge Holland has indicated his readiness to impanel a jury and determine the question of appellant's present sanity or insanity. He is directed to do so without further delay and to certify to this Court the result of such hearing.

"At such hearing appellant's trial attorney the Hon. Joe Tonahill as well as counsel representing appellant in this habeas corpus proceeding shall be given the opportunity to present any competent evidence relative to appellant's present sanity."

On June 3, 1966, this Court received a motion in the form of a telegram which read:

"Mr. William Kunstler and other Jack Ruby counsel have moved before Justice Hugo Black for a stay of the sanity trial you ordered May 18, 1966 for Appellant, Jack Ruby in Appeals #37,900 and 39,613.

"I do not concur in such a motion nor did I participate therein because of my conscientious belief that Jack Ruby is insane and requires adequate psychiatric care which he cannot receive in the Dallas County Jail.

"Nevertheless, since Ruby's other counsel are obviously opposed to the sanity trial, their attitude is such that they could not with the high degree of enthusiasm required in a sanity trial represent the best interest of Ruby. Their petition for a stay of the sanity trial is inconsistent with their duty and ability to prove him insane and obtain a jury finding of insanity. It appears that the best interest

of justice indicates that their motion for stay action is grounds for you to immediately cancel the sanity hearing ordered May 18, 1966 and set the Ruby appeals down during this term for submission and oral argument. Joe H. Tonahill, Atty. of Record for Jack Ruby."

The judgment entered upon the jury's verdict at the sanity trial reads:

"On this the 13th day of June, A.D. 1966, this cause came on for trial as previously set and the State appeared by her Criminal District Attorney and the Defendant, Jack Ruby, appeared in person, his counsel consisting of Honorable Phil Burleson, Honorable Sam Houston Clinton, Jr., Honorable Sol Dann, Honorable Joe H. Tonahill and Honorable Emmett Colvin, also being present, and the question of the present sanity of Defendant, Jack Ruby, having been raised after his conviction, and while his appeal from that conviction was pending and the Honorable Court of Criminal Appeals of Texas having directed this Court to impanel a jury and determine the sanity or insanity of the Defendant, Jack Ruby, and the State announced ready for trial, but counsel for Defendant, Jack Ruby, refused to participate during the trial, but remained present in Court at the request of the Court, whereupon a jury of twelve (12) good and lawful men and women was duly selected, impaneled and sworn to try the issue of Defendant's present sanity or insanity and after counsel for the Defendant declined to present any testimony with reference to the sanity or insanity of the Defendant, the State proceeded to present evidence thereon, after which the Defendant, Ruby, in person testified, at his own suggestion and request and over the objection of his counsel, and after having received the written charge of the Court as to the law applicable to the case, the jury retired in charge of the proper officer, and after deliberation returned into Court the following verdict:

" 'We, the jury, find the Defendant at the present time is sane.'

/s/ Aubrey Wayne Teer'

"It is therefore ordered, adjudged and decreed by the Court that the said Jack Ruby is presently sane.

/s/ Louis T. Holland

LOUIS T. HOLLAND, JUDGE PRESIDING"

The affidavit of Jack Ruby dated June 13, 1966, reads:

"THE STATE OF TEXAS }
"COUNTY OF DALLAS }

"I, Jack Ruby, having this day been declared legally sane, do hereby reaffirm that I have and do discharge Joe Tonahill and, if I have not already done so, do discharge Emmett C. Colvin, Jr. Neither is authorized to represent me in any capacity in any court.

"The attorneys who I desire to represent me are Phil Burleson, Sam Houston Clinton, Jr., Sol Dann, William M. Kunstler, Elmer Gertz and their associates. They are hereby authorized to represent me in all proceedings and matters in which I am involved, particularly on appeal of my conviction and on the habeas corpus matter."

On June 15, 1966, the following order was entered:

"The above entitled and numbered cause on appeal before this Court is set for submission on brief and oral argument for 9:30 A.M. on Friday, June 24, 1966.

"Prior to said submission appellant will designate in writing the attorneys authorized to represent him in this court and said counsel will designate which of them will use the time allowed for oral argument. A similar list of counsel who will argue for the state shall be filed.

"Pursuant to Rule VII of the Rules of this Court the time allowed for oral argument is extended to one hour and thirty minutes opening and thirty minutes rejoinder.

"In addition to the above time allocated to appellant, all counsel appearing of record after the giving of notice of appeal will be permitted to appear and present argument not to exceed thirty minutes as friends of the Court. The same additional time will be allotted to designated representatives of the State.

"Additional briefs may be filed at any time prior to August 1, 1966. The State will be allowed twenty days to reply to the last brief filed in behalf of appellant.

"It is so ordered.

/s/ W. T. McDonald, P. J.

/s/ W. A. Morrison, J.

*"DISSENT*

"To that portion of the order setting this appeal for submission and oral argument which provides that all counsel appearing of record after giving notice of appeal will be permitted to present oral argument, I respectfully dissent.

/s/ K. K. Woodley

Woodley, Judge."

The Amicus Curiae Brief filed prior to March 10, 1965, by Counsel Melvin M. Belli of the California Bar, who was leading counsel for Jack Ruby at his trial, correctly states: "I have applied for, and have graciously been given permission by this Honorable Court to file an amicus curiae brief for Jack Ruby, defendant and appellant. I am specifically advised this does not include the right to appear and argue the cause upon its calling, since I am no longer counsel of record."

While the writer sees no denial of appellant's constitutional right to counsel of his choice, and does not agree with the contention that the sanity hearing was void or deprived appellant of any right, he remains convinced that there was no reasonable basis for inviting those who had been appellant's trial counsel but had been dismissed after notice of appeal to appear and present oral argument as friends of the Court after having denied a like right to his other counsel who withdrew or were "fired" before notice of appeal.

In view of another trial and future trials, it should also be clearly understood that the majority does not hold that a juror who saw the shooting of the deceased on television is, for that reason alone, disqualified or subject to challenge for cause under Art. 616(6) C.C.P. (now Art. 35.16 C.C.P.1965) as being "a witness in the case."